THOMAS J. McCRACKEN, Plaintiff-Appellee, v. OLSON COMPANIES, INC., *et al.*, Defendants (Kenneth P. Olson, Defendant-Appellant).

First District (5th Division)   No. 85—1601

Opinion filed October 17, 1986.

William T. Rodeghier, of Chicago, for appellant.

McCracken & Walsh, of Chicago (Thomas J. McCracken, Jr., and Thomas G. Moffitt, of counsel), for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Plaintiff brought this action to recover attorney fees pursuant to a written contract. The fees were sought to be recovered from an officer/director of the corporation with whom plaintiff had entered into a contract for services. Following a bench trial, judgment was entered in favor of plaintiff and against both the corporation and the individual officer/director. The trial court's judgment against defendant officer/director was entered on the theories of piercing the corporate veil, guarantee, and ratification. An appeal has been taken from the judgment against the individual officer/director of the corporation.

We affirm.

In January 1976 plaintiff, a Chicago attorney specializing in real estate tax, was retained to represent defendant corporation, Olson Companies, Inc. (OCI), in all matters pertaining to the assessment and real estate taxes of a certain property known as the Lake Tower Inn. The Lake Tower Inn property was acquired by OCI in partnership with another corporation in 1974, with OCI retaining 80% interest in the property.

OCI is a Minnesota corporation licensed to do business in Illinois. The corporation was formed in 1972 by defendant Kenneth P. Olson (Olson), a businessman involved in 17 corporations and partnerships with assets of over $75 million in five different States. Olson was, at all times, the sole shareholder, president, and director of OCI.

In 1974 OCI began to experience financial difficulties as a result of a rise in interest rates. At that time Olson proposed to the banks and mortgage holders to which OCI was indebted a plan which would allow the corporation to pay off its outstanding loans by liquidating all its real estate holdings. The Lake Tower Inn property was among those affected by Olson's proposal.

Some time before December 22, 1975, Olson negotiated a comprehensive financing agreement involving the sale and lease of the Lake Tower Inn with Fred Seed, a personal friend. This arrangement, which included Seed's personal guarantee of a $2.2 million mortgage, granted Olson Motor Lodges, Inc. (OML), the right to lease and operate the hotel, as well as the option to purchase the premises upon written notice of the exercise of the option before December 31, 1980. OML, an Illinois corporation, was one of Olson's many business ventures. Up until December 29, 1975, Olson had been the sole shareholder, president, and director of OML. Thereafter, the capital stock of OML was held by Olson as custodian for the benefit of his children. Under the Minnesota Uniform Gift to Minors Act (Minn. Stat. 1984, sec. 527.01 *et seq.*), however, Olson continued to retain full discretionary control of the stock.

On December 22, 1975, Olson, purporting to act on behalf of OML and OCI, executed the lease and option agreement after directing the trustee of the Lake Tower Inn property (the Chicago Title & Trust Company) to execute the mortgage documents. The beneficial interest of the land trust was not, however, assigned to Seed by Olson until January 16, 1976. OML began, at that point in time, to lease and operate the hotel pursuant to the agreed arrangement. In February 1981 the Lake Tower Inn was sold to another party after OML allegedly failed to obtain new financing so that it could exercise its option by December 31, 1980.

Plaintiff claims to have first been contacted by Olson to discuss the possibility of a reduction in the real estate taxes of the Lake Tower Inn property sometime around January 29, 1976. Having executed the financing package on the sale of the property to Seed on December 22, 1975, Olson already knew of the plan for OML to take over the operation of the hotel with an option to purchase. Among other things, an attorney-fee arrangement was discussed at this time. Following their

phone conversation, plaintiff drafted a letter to OCI setting the terms of the proposed legal representation. The letter specifically noted that plaintiff was being granted the authority to represent OCI in all matters pertaining to the assessments of real estate taxes on the Lake Tower Inn property for the years 1975 through 1979. Also set forth in the letter were details regarding the compensation to be paid for the contemplated legal representations. Upon receiving the letter, OCI executed the agreement through Edward Kocourek, the vice-president and secretary of defendant corporation.

Plaintiff subsequently performed the services required by the agreement, obtaining a reduction in the assessed valuation of the property for 1975 and for the 1976 quadrennial assessment. Fee statements were sent by plaintiff to OCI to the attention of Kocourek. Plaintiff claimed fees in the amount of $46,800. As of the time of the trial, defendant had paid plaintiff $18,500 of that sum, leaving a total of $28,300 of the debt still remaining to be paid.

In March 1977, Edward Kocourek resigned from his post at OCI. Plaintiff maintains that he not only had frequent conversations with Kocourek prior to the latter's resignation, but also that he contacted Olson personally on several occasions during this time in order to relate to him his concern for the unpaid fees. Olson denies ever having had any contact with plaintiff while Kocourek was the acting vice-president and secretary of defendant corporation. He also denies ever being aware that plaintiff had been handling any tax matters for OCI or, for that matter, that an agreement had been entered into with him to provide such services. He does, however, acknowledge that Kocourek informed him that somebody was working on the property's tax assessment and valuation.

According to Olson, the first time he came into contact with plaintiff was on May 9, 1978, when the latter threatened to file suit if Olson did not tender the remaining balance still owed him in attorney fees. Olson then informed plaintiff that OML was unable to tender the full amount, that it would nonetheless try to make partial payments, and that, unless OML obtained refinancing in order to be able to exercise its options to purchase, the property would end up being sold to another party. He further claims to have informed plaintiff that, in the event the property was purchased by OML, all monies owed plaintiff would be tendered. Plaintiff allegedly proceeded to make a notation of this for his file, writing down the payment structure.

Plaintiff, however, testified that Olson told him that the filing of a lawsuit would ruin his chances to refinance and that he would personally guarantee the amount due plaintiff in exchange for the latter's

forebearance to bring suit. Plaintiff agreed to this proposal and drew up a memorandum committing their oral agreement to writing. Olson then put his initials to said document.

Upon weighing all of the documentary and testimonial evidence, the trial court held in favor of plaintiff, finding that (1) Olson personally exercised ownership and control of OCI and OML, and that there were such unity of interest and ownership among Olson, OCI, and OML that separate identities of the parties did not exist; (2) the professional services rendered by plaintiff to defendant were not only satisfactory but also financially benefited Olson individually, as well as those entities over which he exercised complete control; (3) Olson ratified the contract for plaintiff's professional services by accepting the benefits thereof; and (4) Olson personally guaranteed the payment owed plaintiff. Olson seeks reversal of the judgment below on the grounds that the findings of the trial court were against the manifest weight of the evidence.

OPINION

The theory that a corporation is an entity separate and distinct from its officers, directors and shareholders provides the traditional basis for the legal concept of limited liability. (*Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043.) Under this general rule such officers, directors, and shareholders will not be held liable for any of the corporation's debts and obligations. (*Stap v. Chicago Aces Tennis Team, Inc.* (1978), 63 Ill. App. 3d 23, 379 N.E.2d 1298.) Where a corporation is found to be merely the alter ego or business conduit of a governing or dominant personality, however, the corporate entity will be disregarded and the veil of limited liability pierced. (*Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 415 N.E.2d 560.) For the corporate veil to be pierced: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that an adherence to the fiction of a separate corporate existence would promote injustice or inequitable consequences. *Stap v. Chicago Aces Tennis Team, Inc.* (1978), 63 Ill. App. 3d 23, 379 N.E.2d 1298.

In determining whether to disregard a corporate entity, the court will not rest its decision on a single factor but will rather look to a number of variables such as inadequate capitalization, failure to observe corporate formalities, the commingling of funds, and the absence of corporate records. (*Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 415 N.E.2d 560.) Where such variables are coupled

with some element of injustice or fundamental unfairness, the corporation will be considered as an aggregate of persons both in equity and at law and its officers, directors, and shareholders will be held individually liable for the corporation's debts and obligations. *Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043.

■ In the instant case the evidence overwhelmingly justifies the finding below that Olson personally exercised ownership and control of OCI and OML and that there was such unity of interest among Olson, OCI and OML so as to make the identities of the individual parties virtually indistinguishable. The record reveals that Olson was the sole shareholder of OCI at all times. Up until December 29, 1975, he was also the sole shareholder of OML. Although thereafter he became the custodian of the stock for the benefit of his children, under applicable law Olson nonetheless continued to retain unilateral and discretionary power over the use of the stock and acted accordingly. (Minn. Stat. 1984, sec. 527.01 *et seq.*) Olson was additionally the president and a director of both corporations at all times. At various times, he acted as the sole director of those companies. His control over the affairs of both corporations, in fact, went so far as to include the personal tendering and signing of company checks.

There is additional evidence that Olson treated the assets and business of the corporations in question as his own. It appears, for instance, that he chose to forego a $1.5 million option on behalf of OML because of his friendship with Seed. This action clearly evidences the foregoing of a corporate opportunity for personal reasons.

Furthermore, there is every indication in the record that Olson failed to comply with the requisite corporate formalities. Although OML conducted the hotel operations until 1980 and allegedly filed tax returns until 1983, the company's stock and minute book fails to show any signed entires past June of 1976. Also noteworthy is the fact that Olson, purportedly acting on behalf of OML, executed the lease and option agreement with Seed as beneficiary at a time when the latter had no interest in the property. Seed did not come into beneficial ownership of the property until sometime in mid-January 1976, yet the execution of the lease and option agreement took place on December 22, 1975. Those mortgage documents, forming part of the comprehensive financing arrangement that included Seed's personal guarantee of a $2.2 million mortgage, were also executed by the trustee prior to Olson obtaining corporate authorization to so instruct the trustee. Having acted prior to obtaining corporate authorization on December 26, 1975, Olson ignored corporate identity, formality, and procedure. As such, he participated in these transactions as the alter ego both of

OML, in executing the lease and option agreement, and of OCI, in directing the Chicago Title and Trust Company (the trustee of the Lake Tower Inn property) to execute the mortgage documents.

By the time plaintiff was retained by Olson to represent OCI in real estate tax matters, Olson already knew of the plan for OML to take over the operation of the hotel with an option to purchase, OCI had already assigned its beneficial interest in the property, and Seed had become the beneficial owner of the property held in trust by Chicago Title and Trust Company. Olson thus received the benefit of the legal representation, as the period of the effective tax reduction coincides with OML's lease on the property. Moreover, although the legal agreements were executed in the name of OCI, the letter of transmittal identified the responsible party as OCI, and the 1977 letter requesting relief for the 1976 quadrennial was on OCI letterhead. Olson chose to honor the obligation of OCI from assets of OML, conduct which evidences the commingling of funds. The absence of a contract or duty requiring such financial transaction leads us to conclude that Olson himself was the sole connecting factor between the two companies.

There is also additional evidence in the record that both corporations were grossly undercapitalized. Various tax returns showed consistent negative retained-earnings figures and virtually no cash on hand. The tax returns of OML alone indicate capitalization in the statutory minimum amount of $1,000. A corporation's capitalization is a major consideration in determining whether a legitimate separate corporate identity was maintained and whether the corporate veil should be pierced. *Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 415 N.E.2d 560.

■ We lastly take notice of the fact that Olson failed to produce certain business records pertinent to the corporations' financial status and that there appears to be no reasonable or legitimate excuse for his inability to do so. An unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under his control. (*Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043.) Given that Olson was the sole shareholder, a director, and an officer of both corporations there can be no question that he had access to these documents. Assuming these records reflected that the corporations were able to meet their obligations, their introduction into evidence could only have favored Olson's position. Because Olson failed to produce a legitimate explanation as to the unavailability of these records, it can reasonably be inferred that those documents would have revealed the corporations' poor financial standing.

The trial court in the case at bar was entitled to conclude from all of the aforementioned evidence that Olson used OML and OCI as facades to avoid rightful responsibility for his acts and that, as a result, the corporations should not be allowed to shield him from liability.

■■ We next consider Olson's contention that the trial court's finding that he guaranteed a corporate obligation was patently without evidentiary support and erroneous as a matter of law since the document in question was neither a guarantee nor a memorandum for purposes of satisfying the Statute of Frauds (Ill. Rev. Stat. 1983, ch. 59, par. 1 *et seq.*)

We do not reach the merits of Olson's Statute of Frauds claim of whether the memorandum in fact complies with the aforementioned statute. The record indicates that no objection whatsoever was made to the introduction of this document at trial, including one based on the Statute of Frauds. More importantly, Olson failed to plead the statute as an affirmative defense in his answer to the second amended complaint and therefore waived the statute as a defense. *Terminal Freezers, Inc. v. Roberts Frozen Foods, Inc.* (1976), 41 Ill. App. 3d 981, 354 N.E.2d 904.

■■■ With respect to the finding that the May 9, 1978, memorandum, initialed by Olson, constituted a guarantee of OCI's indebtedness, we affirm the trial court's decision. A guarantee is a third party's promise to answer for payment of an obligation if the person primarily liable fails to make payment or perform the obligation. (*Arco Petroleum Products Co. v. R & D Automotive, Inc.* (1983), 118 Ill. App. 3d 634, 455 N.E.2d 227.) The document in question states as follows:

"5-9-78

Meeting with Ken Olson

Balance Due: $21,800

Due in 1979: $ 9,500

Due in 1980: $ 9,500

Ken is paying $3,000.00 today to be applied at $1,000.00 per week. Four weeks from today Ken will commence paying $1,000.00 per week until his refinancing is complete or until bill is paid in full."

The memorandum plainly delineates the obligation and Olson's promise to pay that obligation, notwithstanding the conspicuous absence of any words of guarantee. A guarantee agreement does not require a particular form of language. (*Yorkville National Bank v. Schaefer* (1979), 71 Ill. App. 3d 137, 388 N.E.2d 1312.) Any kind of writing, from a solemn deed to a mere hasty note or memoranda, from which the intention of the parties may be gathered will be sufficient. (*Western Metals Co. v.*

*Hartman Ingot Metal Co.* (1922), 303 Ill. 479, 135 N.E. 744.) The declaration that defendant promised to pay the debt accompanied by his personal initial thus constituted a sufficient writing from which the trial court could determine Olson's intent to bind himself personally. Moreover, an agreement by a creditor to extend the time of payment on a debt is sufficient consideration for a guarantee of payment of the debt by a third person, as is an agreement during such time to forbear suit thereon. (*First National Bank v. Chapman* (1977), 51 Ill. App. 3d 738, 366 N.E.2d 937; *Zimmerman Ford, Inc. v. Cheney* (1971), 132 Ill. App. 2d 871, 271 N.E.2d 682.) The memorandum states that the balance due is $21,000 and that Olson will be paying off that balance in installment payments. The obvious underlying implication is that plaintiff is agreeing to an extension of time on the payment of the balance due and to forbear from bringing suit on the obligation.

■■■ We further hold that the trial court's finding with respect to ratification was not against the manifest weight of the evidence. Olson accepted and adopted the legal-representation contract with plaintiff both by executing the May 9, 1978, memorandum and by accepting the benefits of the contract under the guise of OML. While Olson claims that OCI was the one to execute the agreement, it could not have been the real party in interest because at the time of the execution of the agreement OCI held no interest in the property. Further, by affixing his initials on the May 9, 1978, memorandum, Olson identified himself as the real principal. It appears from the evidence in the record that Olson ratified the contract personally because he, in fact, was the party who stood to reap the benefits of such an agreement. An acceptance of benefits under a contract is conduct sufficient to constitute a ratification binding on the party accepting the benefits as if he had signed the contract. (*Bi-County Properties v. Wampler* (1978), 61 Ill. App. 3d 799, 378 N.E.2d 311; *National Brands Stores, Inc. v. Anderson* (1942), 314 Ill. App. 194, 40 N.E.2d 839.) Having both executed the memorandum by affixing his initials and accepting benefits of the plaintiff's work, Olson cannot now escape his obligations under the agreement.

The judgment of the trial court is affirmed.

Affirmed.

PINCHAM and MURRAY, JJ., concur.