WILMA MAGUIRE *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. JAMES L. HOLCOMB *et al.*, Defendants-Appellees and Cross-Appellants.

Fifth District   No. 5—87—0009

Opinion filed May 11, 1988.

Robert E. Ryan, of Alton, for appellants.

John Dale Stobbs and James S. Sinclair, both of Stobbs & Sinclair, Ltd., of Alton, for appellees.

JUSTICE KARNS delivered the opinion of the court:

Plaintiffs Wilma Maguire, Michael Maguire and Judyth Harlan filed a two-count complaint in the circuit court of Madison County seeking rescission of a contract for the purchase of a restaurant. Count I alleged actual or constructive fraud and count II sought relief under the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1981, ch. 121½, par. 261 *et seq.*). Defendants James and Jean Holcomb filed a five-count counterclaim against the corporate plaintiff, Sunray Restaurant, Inc., and the individual plaintiffs, seeking possession of the real estate that was the subject of the transaction along with money damages for waste.

The trial court granted defendants' motion to dismiss count II of the complaint on grounds that the Act did not apply. The court thereafter entered summary judgment for the defendants as to the issue of possession. Following a bench trial, the court entered judgment for the defendants pursuant to section 2—1110 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1110). The court then heard evidence on defendants' counterclaim and entered judgment against the corporate plaintiff only in the amount of $5,535.43. Plaintiffs appeal the dismissal of count II of their complaint and the judgment in favor of the defendants on count I. Defendants appeal the trial court's ruling that only the corporate plaintiff was liable for damage to the property.

On April 30, 1982, the individual plaintiffs entered into a memorandum of agreement with the Holcombs to purchase a restaurant known as the Sunray Cafe. The plaintiffs formed a corporation, Sunray Restaurant, Inc., which entered into a contract for the purchase of real estate and personal property comprising the restaurant business and several adjoining parcels of land. At the time of the transaction, Wilma Maguire, the mother of plaintiffs Michael Maguire and Judyth Harlan, was a 61-year-old widow employed at the Granite City Area Support Center. Michael Maguire was a 27-year-old college graduate. He had attended Southern Illinois University at Edwardsville (SIU-E) in 1975 and 1976 and graduated from Eastern Illinois University in 1978 with a bachelor's degree in psychology. He was employed as a bartender/bouncer at the Music Room tavern in Wood River, Illinois, at the time of the transaction. Judyth Harlan was a high school graduate, approximately 37 years of age, and had a variety of work experience. None of the plaintiffs had any practical experience in business or restaurant management.

James Holcomb was approximately 60 years old at the time of the transaction. He had a bachelor's degree in business and an advanced

degree in education. He had been employed for several years in the accounting department of the Olin Mathieson Corporation and had previously served as an academic advisor at Southern Illinois University at Edwardsville. In addition to owning and operating the Sunray Cafe, he was involved in numerous business activities.

Mrs. Maguire had been acquainted with Mr. Holcomb for approximately 10 or 15 years. She and her late husband had been occasional customers of the Sunray Cafe. Mrs. Maguire was also a long-term social acquaintance of Mrs. Holcomb. Additionally, Mr. Holcomb had been Michael Maguire's academic advisor while he was at SIU-E.

In early 1982 Mrs. Maguire learned that the Sunray Cafe was for sale. Desiring to provide a source of permanent employment for her children, she contacted Mrs. Holcomb, who referred her to the real estate agent handling the property. Mrs. Maguire and Michael Maguire went to the realtor's office, where they were shown a recapitulation of the cafe's income statements for the years 1976-81. Several subsequent meetings took place between the Maguires, Mr. Holcomb, and the real estate agent. At no time did the plaintiffs' bring an accountant or attorney to look over the financial records of the business.

The purchase price of the restaurant was $275,000, with a down payment of $30,000 and the balance to be paid in semi-annual installments of $6,125 plus interest at the rate of 12% per annum. At the end of five years a balloon payment of $183,750 was to be due and payable in full. The balance due on the contract was secured by a retention of title to the real estate and certain stocks and bonds of Mrs. Maguire.

The record indicates that the principal and interest payment was approximately $40,000 for the first year; approximately $39,000 for the 2nd year; and approximately $38,000 for the third year. An examination of the cafe's income statements for the past five years indicates that the highest net profit for the period was $37,015, which occurred in 1976. Profits have declined substantially since then. It is evident from these figures that the proceeds from the restaurant operation would be insufficient to retire the debt. At trial, Mr. Holcomb maintained that he pointed this fact out to the plaintiffs on several occasions, while plaintiffs maintained that it was their understanding that the loan had been structured so that the restaurant could carry it.

Plaintiffs first defaulted in the payment due on August 1, 1983. On August 7, 1983, a payment of $14,597 was made toward the total amount due of $20,457.50. Mrs. Maguire also supplied a personal

check for $2,500 and a $3,000 credit was given for the release of three lots which were also part of the contract. The payment due on November 1, 1983, was satisfied by the surrender of the securities Mrs. Maguire had pledged as collateral, plus a promissory note signed by Mrs. Maguire and Michael Maguire. No further payments were made. This present suit was filed May 21, 1984.

On appeal, plaintiffs argue the court erred in finding that no fiduciary relationship existed between the parties. The essence of plaintiffs' fiduciary relationship argument rests on the disparity of business knowledge and expertise between the parties and the Maguires, long-term social acquaintances with the Holcombs.

■ The general rule concerning fiduciaries is stated in *Ware v. D.R.G., Inc.* (1974), 17 Ill. App. 3d 758, 307 N.E.2d 740:

> " 'A fiduciary relationship is not limited to cases of trustee and *cestui que trust,* guardian and ward, attorney and client, and other recognized legal relationships, but extends to every possible case in which there is confidence reposed on one side and a resulting superiority and domination on the other. The origin of the confidence may be moral, social, domestic, or merely personal. If the confidence in fact exists and is reposed by one party and accepted by the other the relation is fiduciary and equity will regard dealings between the parties according to the rules which apply to such relation. [Citations.]' " *Ware,* 17 Ill. App. 3d at 761-62, 307 N.E.2d at 743; quoting *Warren v. Pfeil* (1864), 34 Ill. 344, 360, 178 N.E. 984.

Proof of such a relationship is generally accomplished "by establishing facts showing an antecedent relationship which gives rise to trust and confidence reposed in another." (*Ray v. Winter* (1977), 67 Ill. 2d 296, 304, 367 N.E.2d 678, 682.) Further, proof must be so clear, convincing and unequivocal that it leads to only one conclusion. *Ware,* 17 Ill. App. 3d at 763, 307 N.E.2d at 744.

Without unnecessarily elaborating, it is clear that there is no fiduciary relationship as a matter of law in this case. None of the traditional types of relationships which give rise to fiduciary obligations are present here. The focus of our inquiry, therefore, is whether a fiduciary relationship existed between the parties as a matter of fact.

■ The mere fact that a business transaction is conducted does not give rise to an inference of a fiduciary obligation. The fiduciary obligation must be predicated upon preexisting relationship of trust between the parties, or, if the alleged fiduciary relationship is to be based on the transaction in question, a showing that the defendant, upon whom a duty to disclose is sought to be placed, at least impliedly

accepted the trust and confidence plaintiff sought to repose in him. (*Schuppenhauer v. Peoples Gas Light & Coke Co.* (1975), 30 Ill. App. 3d 607, 332 N.E.2d 583, *cert. denied* (1976), 425 U.S. 937, 48 L. Ed. 2d 178, 96 S. Ct. 1670.)

■ The evidence offered by plaintiffs of the parties' preexisting relationship essentially consists of three facts: Mrs. Maguire's long-term social acquaintance with the Holcombs, the fact that the Maguires were occasional customers of the cafe and Michael Maguire's student-advisor relationship with Mr. Holcomb some five years prior to this transaction. These facts hardly rise to the level necessary to establish a fiduciary relationship. Were we to hold otherwise, there are few human relationships which would not give rise to a fiduciary obligation.

The remaining facts offered by plaintiffs to prove the existence of a fiduciary relationship consist of the details of the transaction and the disparate level of business knowledge and experience between themselves and Mr. Holcomb. There is no showing that Mr. Holcomb impliedly accepted plaintiffs' trust and confidence such that he became their fiduciary. In fact, all of the evidence offered by plaintiffs leads us to conclude that this was no more than an ordinary arm's-length business transaction.

As with the trial court, we are not unsympathetic to the plaintiffs' plight. And, as pointed out in their brief, we recognize that the law does not require a person to suspect the honesty of those with whom he does business. (See *Federal Trade Comm'n v. Standard Education Society* (1937), 302 U.S. 112, 82 L. Ed. 141, 58 S. Ct. 113.) It does, however, require a reasonable level of prudence in the conduct of one's affairs. A person cannot blindly enter into a business transaction, placing complete faith in the other party that he will look out for the person's best interests, thereby imposing upon him the mantle of a fiduciary. To take the position plaintiff urges would not only make imprudence a shield, but a sword as well. We conclude that the trial court did not err in entering judgment for the defendants pursuant to section 2—1110 of the Civil Practice Act (Ill. Rev. Stat. 1983, ch. 110, par. 2—1110).

■■ ■ Plaintiffs also argue on appeal that defendants' conduct constituted constructive fraud. Constructive fraud is defined as a breach of a legal or equitable duty which the law declares to be fraudulent, irrespective of the moral guilt of the wrongdoer, because of its tendency to deceive others. (*Paskas v. Illini Federal Savings & Loan Association* (1982), 109 Ill. App. 3d 24, 440 N.E.2d 194.) Constructive fraud can only arise, however, where there is a confidential or fiduci-

ary relationship between the parties. (*Gary-Wheaton Bank v. Burt* (1982), 104 Ill. App. 3d 767, 433 N.E.2d 315.) The facts do not support any such relationship here. This was an arm's-length transaction entered into by competent adults. Plaintiffs' bare assertion that they placed trust or confidence in Mr. Holcomb is insufficient to create the type of relationship upon which constructive fraud may be predicated.

▪ Finally, plaintiffs argue that the trial court erred in dismissing count II of their complaint as failing to state a cause of action under the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act) (Ill. Rev. Stat. 1981, ch. 121½, par. 261, *et. seq.*). Plaintiffs argue that the Act does cover real estate transactions even though real estate purchasers do not fit the Act's definition of "consumer." They also argue that this was not merely a real estate transaction, but the purchase of an ongoing business concern.

To determine whether the Consumer Fraud and Deceptive Business Practices Act applies to the transaction in question, it is necessary to examine the relevant sections of the Act. The stated purpose of the Act is

> "to protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce and to give the Attorney General certain powers and duties for the enforcement thereof."

Section 1 of the Act contains the following relevant definitions:

> "(b) The term 'merchandise' includes any objects, wares, goods, commodities, intangibles, *real estate situated outside the State of Illinois,* or services;
>
> * * *
>
> (e) The term 'consumer' means any person who purchases or contracts for the purchase of *merchandise* not for resale in the ordinary course of his trade or business but for his use or that of a member of his household;
>
> (f) The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 121½, par. 261.)

Section 2 of the Act provides:

> "Unfair methods of competition and unfair or deceptive acts

or practices *** or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act *** in the conduct of any trade or commerce are hereby declared unlawful ***." (Ill. Rev. Stat. 1981, ch. 121½, par. 262.)

Reading sections 1(b) and 1(e) together, it would appear that the Consumer Fraud Act does not apply to the purchase of domestic real estate by a consumer. The broad language of section 1(f), however, would seem to include such transactions.

Prior to October 1, 1972, section 1 limited the applicability of the Consumer Fraud Act to the sales and advertisement of "merchandise." As domestic real estate was excluded from the definition of "merchandise," the Act did not apply to the purchase of domestic real estate.

The Consumer Fraud Act was amended, effective October 1, 1973, by Public Act 78—904. The stated purpose of the Act was broadened to include "any trade or commerce" and section 2 was amended to extend applicability of the Act to the conduct of any trade or commerce. The amendment also added subsection 1(f), set out above, defining the terms "trade" and "commerce."

In *People ex rel. Scott v. Cardet International, Inc.* (1974), 24 Ill. App. 3d 740, 321 N.E.2d 386, the court stated that one of the apparent purposes of the amendment was to extend the scope of the Consumer Fraud Act to the conduct of any trade or commerce. Noting its agreement, the court in *Beard v. Gress* (1980), 90 Ill. App. 3d 622, 413 N.E.2d 448, held that the Act applied to the sale of domestic real estate and permitted purchasers of domestic real estate to sue for violations of that section even though they do not come within the definition of "consumer." *Beard*, 90 Ill. App. 3d at 627, 413 N.E.2d at 452.

We note, however, that in amending the Act, the General Assembly did not change the definitions of "consumer" or "merchandise." Rules of statutory construction dictate that the General Assembly must have had a purpose for not changing the definitions. The logical assumption would be that the legislature intended that purchases of domestic real estate by consumers not be covered by the Consumer Fraud Act.

We need not resolve this apparent contradiction in language, however, as the facts as found would not support a claim under the Consumer Fraud Act even if it did apply to real estate transactions. We conclude that the trial court committed no reversible error in dismissing count II of plaintiffs' complaint.

■ Defendants also appeal the trial court's ruling that only the

corporate plaintiff, Sunray Restaurant, Inc., was liable for money damages due to waste. They argue that the sole purpose of incorporating was to shield the individual plaintiffs from personal liability on the loan.

Illinois courts utilize a two-pronged test to determine whether the corporate veil should be ignored and the corporate owners be held liable for the corporation's debts: (1) whether there is a unity of interest and ownership and (2) whether adherence to the corporate fiction would promote injustice or an unequitable result. (*McCracken v. Olson Cos.* (1986), 149 Ill. App. 3d 104, 500 N.E.2d 487.) We do not believe the second prong of the test has been met here. One of the very purposes of the corporate form of business is to shield the individual owners from personal liability. To effectuate that purpose here would not do defendants an injustice and we conclude that the trial court did not err in its ruling.

The judgment of the circuit court of Madison County is affirmed.

Affirmed.

LEWIS and CALVO, JJ., concur.