KELSEY AXLE & BRAKE DIVISION, a division of Kelsey-Hayes Company, Plaintiff-Appellant and Cross-Appellee, v. PRESCO PLASTICS, INC., *et al.*, Defendant-Appellees and Cross-Appellants.

First District (6th Division)   No. 1—88—1289

Opinion filed August 11, 1989.

394

McKenna, Storer, Rowe, White & Farrug, of Chicago (James P. DeNardo, Lyndon C. Molzahn, Thomas R. Schutt, and Christine L. Olson, of counsel), for appellant.

Phelan, Pope & John, Ltd., of Chicago (Roseann Oliver and Therese A. Kelly, of counsel), for appellees.

PRESIDING JUSTICE EGAN delivered the opinion of the court:
The plaintiff, Kelsey Axle & Brake Division (Kelsey), sued three corporations, Presco Plastics, Inc. (Presco), Bob Goltermann & Associ-

ates, Inc. (BGA), and KI Industries, Inc., which during the time pertinent to this appeal, 1978-1980, was Knobs, Inc. (Knobs). The plaintiff claimed that it had contracted with Presco to manufacture plastic pistons which were to be incorporated into brake cylinders produced by the plaintiff which it sold to Harley-Davidson to be used in rear brakes in motorcycles. The plastic pistons were defective, and the plaintiff was damaged in that it was required to participate in a recall campaign with Harley-Davidson and to expend substantial sums of money in settlements and judgments arising out of lawsuits against it and for attorney fees in defense of those lawsuits.

Presco, however, became insolvent and was dissolved. Consequently, the plaintiff also sued KI Industries, formerly Knobs, and BGA on a "piercing the corporate veil" theory, alleging that Presco was the alter ego of BGA and Knobs. The judge first heard evidence on the plaintiff's claim against BGA and Knobs. He held that the plaintiff had failed to establish that Presco was the alter ego of BGA and Knobs and entered judgment for BGA and KI Industries.

The judge then heard the claim against Presco and entered judgment for the plaintiff on two counts and for Presco on the two remaining counts. He denied the plaintiff's claim for attorney fees incurred in defending the various lawsuits filed against it.

The plaintiff appeals from the judgment in favor of BGA and KI Industries, from the judgment in favor of Presco on two of the counts of the complaint and from the order denying attorney fees. Presco appeals from the judgment in favor of the plaintiff on two of the counts of the complaint.

We will first consider the plaintiff's appeal of the judgment in favor of BGA and KI Industries. It contends that the judge's finding was against the manifest weight of the evidence.

As in most, if not all, cases involving the issue of manifest weight of the evidence, a rather detailed recitation of the evidence is required. Presco, a Wisconsin corporation, was a custom molding machine shop with approximately five employees operating in Milwaukee. Knobs, an Illinois corporation, was in the business of manufacturing knobs for an appliance industry. Robert Goltermann (Robert) and his wife, Marsha Goltermann, were the sole shareholders of Knobs. Robert was the chairman and treasurer of Knobs, his wife was the secretary and his brother, Carl Goltermann (Carl), was the president.

BGA was a manufacturer's representative. Robert was the sole shareholder, the chairman, president and treasurer; and his wife was the secretary.

Sometime before February 5, 1975, Carl and Robert discussed purchasing a custom molding company that could do molding work for Knobs and would operate as a separate company. Presco was purchased and later capitalized by Knobs with $50,000. Knobs added another $35,000 through a loan to Presco, several days after the purchase. Carl, the president of Knobs, also became the president of Presco.

The plaintiff emphasizes the following facts in support of its argument that the manifest weight of the evidence establishes that Presco was the alter ego of Knobs and BGA:

(1) The officers of Knobs held the same positions in Presco. Robert and his wife were the sole shareholders of Knobs, and Robert was the sole shareholder of BGA.

(2) Carl supervised the daily running of Presco and determined what equipment Presco needed. He made the decision not to purchase product liability insurance.

(3) Knobs paid Carl's salary as president of Presco and his traveling expenses.

(4) Forty to fifty percent of Presco's revenue was to Knobs, and Knobs purchased approximately one-third of its products from Presco.

(5) From 1976 through 1980 all three companies filed consolidated tax returns; and Knobs received tax credits from Presco's business operating losses.

(6) Robert and Carl were signators on Presco's bank account.

(7) From 1976 to 1978, Presco leased all its equipment from BGA, which was not in the business of equipment leasing.

(8) Between 1975 and 1979 both BGA and Knobs loaned money to Presco, but there was no note, no collateral and no repayment schedule.

(9) On September 30, 1975, BGA loaned Presco $23,000 and on the same day Presco paid Knobs $23,000. In February 1978 Knobs paid Presco $60,000, and Presco paid BGA $60,000. In June 1978 Presco received $20,000 from BGA, which Presco then paid to Knobs. In 1979, of Presco's $200,000 in liability, $110,000 was owed to BGA and Knobs.

(10) After the initial corporate meeting of Presco in 1975, there were no other minutes in Presco's corporate minute book. As of March 28, 1979, Presco's last meeting was February 1975. From 1978 through 1980 there are no entries in Knob's corporate minute books regarding Presco.

(11) Presco lost money from 1975 to 1978. In 1979 Carl was discour⸱ ⸳ed about Presco ever becoming a "successful venture" and con-

cluded that Knobs should stop buying from Presco. There was no Presco corporate resolution to terminate Presco's existence; nor was there any corporate resolution by Knobs, Presco's sole shareholder, to terminate Presco's existence. Presco's assets were simply sold. The remaining $17,000 Presco owed to BGA was never repaid. BGA never instituted any legal proceedings to recover the remainder of the money due from Presco.

The plaintiff also presented expert testimony from Donald Brenner. It was his opinion that Robert controlled, owned and managed the three corporations, employed other people and operated all three corporations as if they were one entity; and that the corporate separateness of the three was largely ignored.

The defendants refer to the following evidence as support for their position:

(1) Carl's activities with respect to Presco were to oversee the management and financial condition of the company. They did not entail day-to-day supervision over the company. Presco was run by a general manager, and Carl traveled from Illinois to Presco only about once a week. Robert's sole role with respect to Presco was to confer with Carl on the financial condition of Presco.

(2) At the time that Knobs purchased Presco, Presco did not have product liability insurance. The decision not to obtain such insurance was made by Carl with his brother's advice.

(3) Presco at all times maintained its own corporate identity with respect to its customers and creditors, its own corporate records, financial statements, bank account and filings with the States of Illinois and Wisconsin.

(4) Carl hired a plant manager who was responsible for Presco's day-to-day operations and its work and who had check-signing authority. Although Carl and Robert also had check-signing authority, Carl only occasionally signed checks, and Robert did not recall ever signing any. Presco's plant manager, along with Carl, was involved in various operational decisions, such as determining what equipment Presco needed and the materials Presco should purchase. Presco paid no salaries, bonuses or other remunerations to its officers, including Carl, nor did it ever pay their expenses. Carl's travel expenses to Milwaukee were paid by Knobs.

(5) Presco was never more than a marginally profitable business. From time-to-time additional cash was needed to maintain its operations and Presco borrowed money from a local Milwaukee bank as well as from Knobs and BGA. The loans from Knobs were made at Carl's discretion, and the loans from BGA were made with Robert's

knowledge and approval. Although no security for the loans was required by Knobs and BGA, interest was charged on the loans, and repayments on the loans were made by Presco as business permitted. Repayments were duly noted on Presco's ledger and on the books of both Knobs and BGA. Carl testified that at least some of the loans were evidenced by notes. There is no evidence that funds of Presco were ever transferred or used by Knobs or BGA. The opposite is true: funds by Knobs and BGA were constantly infused into Presco for the benefit of Presco.

(6) Presco required additional machinery and equipment in order to expand and modernize its operations to increase profitability. Presco purchased some of the necessary equipment but needed financing for other equipment. Carl looked into bank financing but ultimately arranged financing through BGA. BGA, although not in the business of equipment financing, had previously purchased equipment for other customers and had entered into equipment leases with those customers. BGA purchased equipment for Presco and leased it to Presco under written equipment leases. The leases to Presco followed the terms a bank would require and were negotiated fairly with Presco.

(7) Knobs, which did not perform custom molding, became a customer of Presco's and paid the same price, under the same terms and billing as other Presco customers. Knobs also utilized other custom molders besides Presco. In fact, Knobs purchased more molded parts from the other custom molders than it did from Presco.

(8) As a manufacturer's representative, BGA represented Presco in attempting to increase Presco's business and sales. BGA received commissions from Presco as it did from other businesses it represented. Those commissions were minimal over the years and never exceeded $1,000.

(9) Presco was an Illinois corporation but was authorized by the State of Wisconsin to do business there. Presco filed annual reports in Wisconsin and Illinois and paid Milwaukee withholding taxes on all its employees, as well as other local taxes. A corporate ledger was maintained by Presco which reflected sales to all its customers, loans and repayments with interest, operating expenses and the purchase and leasing of equipment.

(10) BGA filed its own annual reports with the State of Illinois and its own corporate tax returns. As required by law, BGA also identified Presco, Knobs and BGA as "control group corporations" for tax purposes. Although it shared office space with Knobs, BGA always paid Knobs its *pro rata* share of rent and use of office equipment. BGA maintained its own records reflecting its business transac-

tions.

(11) Knobs always filed its annual reports with the State of Illinois. As parent corporation of Presco, Knobs filed consolidated tax returns from 1976 to 1980 with Presco identified as its subsidiary. Although Knobs received tax credits generated by Presco's business operating loses on its returns, Knobs provided Presco with cash reimbursements for such credits. Knobs maintained general ledgers reflecting all its business transactions.

(12) All three companies maintained separate corporate records. The Goltermanns' personal attorney, George Hodges, was responsible for drafting corporate minutes and records for the three companies. The Goltermanns generally informed Hodges of the actions they planned to take regarding the corporations and relied on Hodges to draft minutes recording those actions. Often Carl would draft correspondence to Hodges reminding him to draft minutes reflecting the activities of the companies.

(13) Presco continually had problems with equipment, labor and quality. It was not unusual for Presco's customers, including the plaintiff, to return parts for reworking before accepting them and paying for them. Knobs was becoming more dissatisfied with the quality of work Presco was performing for it. In the late summer of 1979 Carl and Robert agreed that Presco would never be a profitable business and that it should stop doing business. They agreed that Presco's assets should be liquidated and that all its creditors should be paid in full. In October 1979 Presco shut down operations and all its equipment and assets were sold, and all its creditors were paid in full. BGA was paid the book value of the equipment it had leased to Presco. The only unpaid debt was approximately $17,000 owed on BGA's loan.

The defendants also produced an expert witness, Charles Murdock. It was his opinion that Presco was organized and operated as a separate and distinct legal entity. Although the three corporations were related in that they shared common directors, officers and shareholders, and although both BGA and Knobs had an interest or economic stake in Presco, that interest did not mean that the corporations were not separate corporate entities. He considered two factors important in his determination that the businesses were operated as separate entities: Presco was not operated as a sham corporation of either Knobs or BGA and the operation of Presco was not fraudulent and did not result in any injustice to its customers or creditors.

It was also his opinion that because Presco had assets and was an ongoing business, its capitalization of $50,000 was adequate. He also relied on the fact that all three corporations were involved in differ-

ent businesses and had different locations, employees and bank accounts. There was no indication of any misrepresentation or holding out in the operation of Presco. All of Presco's listings, advertisements, letterheads and invoices indicated that Presco was a separate entity located in Wisconsin. The fact that a Milwaukee bank loaned money to Presco was a further indication that third parties also believed that Presco was a separate entity.

He also found it significant that Presco, BGA and Knobs did business with each other on a fair, arm's-length basis. All the prices charged among the companies were comparable to prices charged to other customers, and records of all transactions were kept. It is an acceptable business practice for a parent corporation, such as Knobs, to take the tax benefits of a subsidiary's operating losses. The fact that Presco was reimbursed by Knobs in cash for those tax credits was a further indication that the corporations were operated as separate entities and without any unfairness to Presco. The equipment leases between BGA and Presco appeared to him to be fair, arm's-length transactions. The fact that loans were made to Presco by BGA and Knobs only indicated a flow of funds into Presco for the benefit of the company and its creditors and customers, such as Kelsey, and not any unfairness to Presco.

In summary he found that no assets or funds were commingled by Knobs or BGA, that there was no indication of any misuse of funds; and he was not aware of anything that any of the companies did with respect to Presco that resulted in harm to any of Presco's customers or creditors.

■■ ■ In analyzing the evidence in this case it should be kept in mind that a plaintiff seeking to have a corporate identity disregarded has a substantial burden. On this question the supreme court has spoken thus (*Main Bank v. Baker* (1981), 86 Ill. 2d 188, 204-05, 427 N.E.2d 94):

> "It is a well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors and officers and, generally, from other corporations with which it may be affiliated. (*Dregne v. Five Cent Cab Co.* (1943), 381 Ill. 594.) Stock ownership alone in one corporation by another does not create an identity of interest between the two or create the relation of principal and agent, representative, or alter ego between the two. Nor does the use of common officers and directors of itself render one corporation liable for the obligations of another. (*Superior Coal Co. v. Department of Finance* (1941), 377 Ill. 282.) These practices are common and ex-

ist in most parent-subsidiary relationships. (*Steven v. Roscoe Turner Aeronautical Corp.* (7th Cir. 1963), 324 F.2d 157, 161.) Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice. *People ex rel. Scott v. Pintozzi* (1971), 50 Ill. 2d 115, 128-29; *Dregne v. Five Cent Cab Co.* (1943), 381 Ill. 594, 603-04; *Superior Coal Co. v. Department of Finance* (1941), 377 Ill. 282, 294; see generally Annot., 38 A.L.R.3d 1102 (1971)."

Our review of the record does not convince us that the finding of the trial judge is against the manifest weight of the evidence. A finding may not be overturned merely because a reviewing court might disagree or might have come to a different conclusion. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 226 N.E.2d 624.) In this case, however, we have no reservations about the trial judge's findings. We agree with them.

A party seeking to have a corporate identity disregarded must come forward with a substantial showing that one corporation is really a dummy or sham for another. (*Walker v. Dominick's Finer Foods, Inc.* (1980), 92 Ill. App. 3d 645, 415 N.E.2d 1213.) The plaintiff has failed to make such a substantial showing. Indeed, even the plaintiff's expert's testimony was riddled by the defense. On cross-examination he admitted that a number of his basic assumptions were incorrect and that he formed his opinions before he reviewed most of the three corporations' records. Although he had believed that all three corporations were involved in the same business, he admitted he now knew that Knobs was in the business of assembling and selling knobs to the appliance and entertainment industry while Presco was a custom molder and BGA was a manufacturers' representative. Although he believed that Presco was inadequately capitalized, he admitted that at the time of purchase Presco's debt-equity ratio was within the guidelines of other companies in the industry. He was unaware that interest had been paid on the loans to Presco and conceded that, if interest had been paid, the transfers of cash to Presco could be legitimate loans. Other than those loans he admitted that he did not find any evidence that Knobs removed money from or stripped the assets of Presco. He also testified that he had no evidence that the equipment leases between Presco and BGA were not arm's-length transac-

tions. He was not aware that BGA had equipment leases with other companies, and he said that BGA's practice of leasing equipment to other customers tended to show that Presco was treated as a separate corporate entity. He was not aware that Knobs had provided Presco with cash reimbursements for any tax credits it had received as a result of Presco's operating loss. He had no opinion whether the decision to terminate Presco in October of 1979 was a reasonable business decision, and he was also not aware of any other creditor or customer, other than BGA, who was harmed or adversely affected by Presco's operation.

The plaintiff has cited three cases, all of which are affirmances of the trial court's finding that one corporation was the alter ego of another corporation or individual. (*Van Dorn Co. v. Future Chemical & Oil Corp.* (7th Cir. 1985), 753 F.2d 565; *McCracken v. Olson Cos.* (1986), 149 Ill. App. 3d 104, 500 N.E.2d 487; *Macaluso v. Jenkins* (1981), 95 Ill. App. 3d 461, 420 N.E.2d 251.) Each case is factually distinguishable from this one, and we need not discuss them at length. But, we note that in *Van Dorn* the court held that the record clearly supported the trial court's finding that the assets of the insolvent corporation were dissipated for the benefit of the other related corporations and to the injury of the plaintiff. (*Van Dorn*, 753 F.2d at 572.) In *McCracken* the court said that the defendant used the corporations as "facades to avoid rightful responsibility for his acts." (*McCracken*, 149 Ill. App. 3d at 112.) In *Macaluso* the defendant commingled the assets of his corporation with the assets of a not-for-profit corporation and used some of the assets of the not-for-profit corporation to pay his personal obligations. In this case there is no dissipation of Presco's funds for the benefit of Knobs or BGA; there is no evidence that Presco was a facade used by Knobs or BGA to avoid their rightful responsibility for their acts; and there is no evidence that Knobs or BGA commingled the assets of Presco with theirs or used the assets of Presco to pay their obligations.

For these reasons the judgment of the circuit court on behalf of BGA and KI Industries, Inc., and against Kelsey is affirmed.

We turn now to the appeal of Kelsey from the judgment in favor of Presco on counts II and III. Count II alleged Presco's breach of the implied warranty of fitness for a particular purpose and count III alleged Presco's breach of an implied warranty of merchantability. The damages sought were the costs of the recall campaign of Harley-Davidson paid by Kelsey, the money paid by Kelsey for settlements of claims and payment of judgments and attorney fees incurred in defense of the claims. Both sides agree that the issues are governed by

Wisconsin law.

Presco asserts several arguments in support of the judgment:

(1) Kelsey failed to prove that it advised Presco of the specific uses of the piston parts machined by Presco, or that Kelsey relied on Presco's judgment and skill in selecting the pistons.

(2) Kelsey failed to prove that Presco's breach of warranties caused the $2 million in losses claimed.

(3) Kelsey failed to provide sufficient notice of the breach of warranty to Presco.

(4) Kelsey's claim is barred by the Illinois statute of limitations, *laches* and *res judicata*.

The trial judge said that he was ruling in favor of Presco on counts II and III because the purpose for which the cylinders were to be used was not sufficiently "defined" to Presco "to hold [it] to the standard of care which is necessary." He ruled against the defendant on all the affirmative defenses. He did not address the defendant's argument that Kelsey had to provide sufficient notice of the breach of warranty.

The Wisconsin Commercial Code provides as follows (Wis. Stat. Ann. §402.315 (1964)):

> "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under [the next section] an implied warranty that the goods shall be fit for such purpose."

At the outset, we agree with Kelsey's argument that the judge's finding that Kelsey had not sufficiently defined the piston's purpose to Presco was irrelevant to the claim of breach of warranty of merchantability. However, in view of the position we take that other grounds support the judgment on both claims for breach of warranty, it is not necessary that we address the question of whether the seller knew of the buyer's particular or special purpose for the product or that the buyer relied on the seller's judgment and skill in selecting the goods.

■ A reviewing court may affirm a correct decision for any reason appearing in the record, regardless of the basis relied upon by the trial court. (*Bell v. Louisville & Nashville R.R. Co.* (1985), 106 Ill. 2d 135, 478 N.E.2d 384.) We hold that the judgment should be affirmed but for a reason not addressed by the judge and for the additional reason that the plaintiff failed to prove that its damages were proximately caused by any breach of the defendant.

First, the defendant argues, and we agree, that the plaintiff did not meet the notice requirement of the Wisconsin Commercial Code, which provides as follows (Wis. Stat. Ann. §402.607(3)(a) (1964)):

> "The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."

The burden is on the plaintiff to prove that the notice provided was reasonable under the circumstances.

Kelsey points to the following evidence as proof that it complied with the notice provision of the statute.

On June 1, 1979, Kelsey issued Presco a discrepant material report indicating that pistons were made of the wrong material and had been rejected by Kelsey on May 24. James Williams, Kelsey's manager of quality control, testified that he told Leo Darts, an employee of Presco, that "it was the wrong material." On September 4, 1979, Kelsey sent Darts the following letter:

> "Leo—confirming your phone conversation this date with Mr. Zagacki, enclosed for your information are copies of the correspondence received from Harley-Davidson relative to the 'recall program'. If you have any further questions or comments please direct them to Mr. Zagacki or myself. Thank you."

The copies of the correspondence received from Harley-Davidson were not made part of that letter; but, we assume that they consisted of notices sent by Harley-Davidson to owners of motorcycles and to a Federal agency. Those notices were exhibits which were received in evidence; and we will refer to them later. Kelsey argues that the discrepant report itself, the conversation between Williams and Darts and the letter to Darts established the required notice.

On the other hand, Kelsey continued to do business with Presco after May 24. Williams testified that he did not have "any quarrel" with the pistons after May 1979. He said that the report was a "[n]ormal method of notifying vendors [and] suppliers of problems" and used codes that were to inform vendors of the alleged problems with parts. When asked if he told anyone at Presco that there was a problem, he answered that the people at Presco told him what the problem was.

The discrepant report also contains an entry, "Scrap at vendor's expense." The exhibit includes a bill to Presco for the "wrong material." The inference is clear, since Presco paid all outstanding debts, that that bill was paid. Presco had the right to assume that that was the end of the matter. In our judgment, this evidence does not establish that Kelsey was placing Presco on notice that it considered Pre-

sco to have breached its warranties.

The case cited by Kelsey is factually wide of the mark. In *Paulson v. Olson Implement Co.* (1982), 107 Wis. 2d 510, 319 N.W.2d 855, the Wisconsin Supreme Court held that the notice was sufficient, and rejected the previous rule that the notice required that the seller be informed that the buyer would look to him for damages. The plaintiffs purchased a grain drying bin and informed the defendant manufacturers within approximately two months that the equipment was not performing as expected. There were numerous instances where the defendants' employees went to the plaintiffs' farms and attempted to alleviate the drying problems about which the plaintiffs repeatedly complained. The defendants inspected the equipment and recommended increasing the drying temperature. They replaced a drying fan and installed a new drying floor facility. When the defendants were unable to cure the defect, the plaintiff filed suit. The factual differences between that case and this one should be obvious; and we note that the court cited for comparison purposes another Wisconsin case, *Marsh Wood Products Co. v. Babcock & Wilcox Co.* (1932), 207 Wis. 209, 240 N.W. 392, that held notice was improperly given where 20 months had elapsed from the time of the occurrence and the plaintiff had ordered the same product without complaint during that time. We recall, at this point, the testimony of Kelsey's employee that it had no "quarrel" with Presco's pistons after May 24 and continued to do business with Presco. We do not believe that the *Paulson* court would have held as it did if the plaintiffs continued to use the drying device for another two or three months and filed suit three years after that.

■ By 1979, Kelsey had begun receiving notice of third-party actions filed against Harley-Davidson as a result of alleged malfunctions of master cylinders. It did not notify Presco that Kelsey was involved in third-party litigation as a result of Presco's manufactured parts or that it was holding Presco liable for the costs incurred as a result of those third-party actions. It was not until suit was filed in November 1982, 3½ years later, that Presco learned of Kelsey's specific claims. Wisconsin courts have held in a number or cases that a particular lapse of time renders a notice unreasonable as a matter of law. See, *e.g.*, *Herman v. Smith, Kline & French Laboratories* (E.D. Wis. 1968), 286 F. Supp. 694 (notice after 2½ years); *Barlow v. DeVilbiss Co.* (E.D. Wis. 1963), 214 F. Supp. 540 (notice given 11 months and 3 weeks after breach); *Schaefer v. Weber* (1953), 265 Wis. 160, 60 N.W.2d 696 (delay of five months in notifying seller of breach).

We believe that an examination of another part of the Wisconsin notice statute discloses support for Presco's position. In addition to that part of section 402.607 requiring reasonable notice, to which we have previously referred, the statute further provides as follows (Wis. Stat. Ann. §402.607(5) (1964)):

"(5) Where the buyer is sued for breach of a warranty or other obligation for which his seller is answerable over:

(a) He may give his seller written notice of the litigation. If the notice states that the seller may come in and defend and that if the seller does not do so he will be bound in any action against him by his buyer by any determination of fact common to the 2 litigations, then unless the seller after seasonable receipt of the notice does not come in and defend he is so bound."

Implicit in the statute is the conclusion that the seller will not be bound if the buyer does not give him written notice of the litigation.

In our judgment, to permit the plaintiff to sit by for 3½ years, to voluntarily pay the costs of Harley-Davidson's recall campaign, to manage the defense of the litigation, including the retaining and payment of lawyers, to settle cases under whatever terms it deemed appropriate and then to saddle the unsuspecting defendant with those costs would be contrary to the spirit of the statute and simple justice.

We also believe that the plaintiff failed to prove that the damages claimed were proximately caused by any breach of warranty. The plaintiff relies on the testimony of James Williams and Bocena Baranowski, a paralegal in the legal department of Kelsey.

Williams testified that he received complaints from the service department of Harley-Davidson. He learned that the nylon used by Presco in the manufacture of the pistons was different from that used by the previous manufacturer and was not within the specifications Kelsey gave Presco. Absorption tests he conducted in April and May 1979 showed that the nylon used in the Presco pistons absorbed five times as much water as the nylon required by the specifications. Kelsey also had dimensional problems with the pistons, and Kelsey had to grind the outer diameter of the pistons to make them conform with the specifications. In June, after notifying Harley-Davidson of the results of the absorption tests, he met with representatives of Harley-Davidson, and Kelsey agreed to defend the claims made against Harley-Davidson. Kelsey also prepared 14,000 repair kits which were sent to Harley-Davidson to be sent in turn to owners of the motorcycles. The repair kit contained much more than the piston; according to Williams, it included some of the "important parts in the master cylin-

ders" which were the piston, oval-ring, the primary cup and "several other components." The decision to recall the master cylinder was made by Harley-Davidson. Kelsey paid Harley-Davidson $158,043.98 as a result of the recall.

Williams identified a number of claims including lawsuits filed against Harley-Davidson. A few of the lawsuits also named Kelsey. He said that all the settlements or judgments involved the master cylinder, which included components. In none of the claims or judgments paid by Kelsey was there any adjudication of fault on the part of Presco. He examined some, but not all, of the motorcycles involved in the claims.

On redirect examination Williams said he did not examine the pistons as a reconstruction expert. He only measured them and that told him only if the piston had swelled. The record does not disclose whether any of the pistons he examined had, in fact, swelled. He could not tell by looking at any of the pistons whether it was a Presco piston or one manufactured by the previous company. He could not tell by looking at the piston the particular date it was manufactured. There is a date code on the cylinder, but there is no date code on the piston. All of the cylinders involved were date coded between February and May 1979.

He made no review of the claims to determine whether the accident occurred through operator error. He did not know how the accidents happened. He only knew that they were *claimed* to be related to the recall. There never was any determination that there was an absorption problem with any of the pistons involved in the accidents. He did not do any absorption tests on the pistons involved. He admitted that a brake might fail on a Harley-Davidson for reasons other than the piston. Some of the claims were dismissed in favor of Harley-Davidson and Kelsey.

Bocena Baranowski identified the Harley-Davidson claims, including copies of complaints, and the records concerning the amounts paid by Kelsey in the settlements and judgments as well as the expenses and attorney fees connected with the litigation and the recall campaign. She had no knowledge of the merits of the lawsuits or the reasonableness of the settlements, judgments, expenses or attorney fees.

The position of the defendant was made clear in the trial court in the remarks of its attorney. The record attributes the remarks to the lawyer for the plaintiff; but, we believe that the lawyer for the defendant made them:

> "Your Honor, the burden that the plaintiff has is proving that each one of these claims that they think they are entitled to re-

cover for was, in fact, by an absorption problem in this piston."
Later she spoke to the court as follows:

"Well, it's our position that in order to prove that Presco is responsible for these amounts, the plaintiff has the burden of showing that number one, there was, in fact, a finding or some kind of evidence that the allegations of the complaint and the plaintiff's injury was caused by this piston problem."

No one ever took issue with those statements of Presco's attorney, and we believe they were proper summaries of the issue before the trial court and before us.

The only proof in support of causation is the testimony of Williams that the claims involved the master cylinder, of which the piston is but one part. There is no showing that the master cylinder, let alone the piston, caused any of the accidents.

It is interesting to note that the notice sent by Harley-Davidson to the Office of Compliance of the National Highway Traffic Safety Administration informed the agency that a possible defect existed in the rear brake master cylinder which "appears to allow absorption to a greater degree than the material specified." The notice also recited that *"it is possible, though extremely unlikely,* that this condition may become severe enough to make the rear wheel skid and possibly cause the motorcycle operator to lose control." (Emphasis added.) The notice concluded that "the information presently available suggests that *only a small percentage [of the 21,970 vehicles produced with the defective piston] may ever experience possible master cylinder malfunction to any degree due to this problem."* (Emphasis added.)

In our judgment it is obvious that the plaintiff has failed, as a matter of law, to prove that the pistons manufactured by Presco caused the damages proved by Williams and Baranowski. Kelsey has not cited any case, nor do we believe one exists, to support its argument.

For these reasons, the judgment in favor of Presco on counts II and III is affirmed.

We turn now to the cross-appeal of Presco from the order granting judgment in favor of Kelsey on counts I and IV. Count I was a breach of contract action, and count IV was a negligence action. The damages prayed for in counts I and IV were the same as those prayed for in counts II and III. Counts I and IV are based on the same facts as the claims under counts II and III. Since we have determined that the plaintiff has failed, as a matter of law, to prove that the damages claimed were the result of any defect in the pistons manufactured by Presco, we hold that judgment should not have been en-

tered for the plaintiff on counts I and IV. Therefore, the judgment on counts I and IV in favor of Kelsey is reversed.

■■ The last assignment of error is Kelsey's contention that the court erred in denying attorney fees. Again, since we have concluded that Kelsey failed to prove a causal connection between the pistons manufactured by Presco and the damages claimed by Kelsey, it necessarily follows that its claim for attorney fees must also fall. Therefore, the order denying attorney fees to Kelsey is affirmed.

In view of our holding, it is unnecessary that we pass on the other claims of Presco that Kelsey's claim is barred by the Illinois statute of limitations, *laches* or *res judicata*.

In summary, the judgment in favor of BGA and KI Industries is affirmed; the judgment in favor of Presco on counts II and III is affirmed; the order denying attorney fees to Kelsey is affirmed; and the judgment in favor of Kelsey on counts I and IV is reversed.

Judgment affirmed in part, and reversed in part.

McNAMARA and LaPORTA, JJ., concur.