TERMINAL FREEZERS, INC., Plaintiff-Appellee, *v.* ROBERTS FROZEN FOODS, INC., Defendant-Appellant.

Third District   No. 75-264

Opinion filed September 10, 1976.—Rehearing denied October 12, 1976.

Sidney S. Deutsch, of Rock Island, for appellant.

Frederick Kopp, of Rock Island, for appellee.

Mr. JUSTICE STOUDER delivered the opinion of the court:

The plaintiff, Terminal Freezers, Inc., commenced this action in the circuit court of Rock Island County against the defendant, Roberts Frozen Foods, Inc., to recover approximately $2,500 for storage and freezing services provided the defendant. The defendant answered the complaint and filed a counterclaim which alleged that the parties had entered into a contract which provided specific rates for the storage and

freezing services and plaintiff had violated the terms and rates set out in the contract. Roberts' counterclaim also charged that Terminal's negligence had resulted in a shortage of inventory and damage to Roberts' merchandise, that Terminal had made errors in calculating amounts due Terminal, and finally that Terminal had made wrongful charges. The total amount of Roberts' counterclaim was approximately $27,400. After a bench trial, the circuit court entered judgment in favor of Terminal for $1,251.09.

This suit centers on two closely affiliated operations, egg-breaking and cold storage, each of which were here conducted by separate business entities. Eggs are received and stored at a public cold storage facility. The eggs are then transferred to a separate section of the same building where the eggs are broken by a highly specialized machine. The machine discards the egg shells and pumps the liquid portion of the eggs into containers to be returned to the cold storage area. The liquid eggs are then either refrigerated to above freezing temperatures or are frozen solid. The still liquid eggs are generally sold to local bakeries for immediate use and the frozen eggs are stored for future sale. The plaintiff, Terminal, conducted the cold storage and freezing operations, while the defendant, Roberts, conducted the egg-breaking phase.

Prior to April, 1964, the cold storage operation had been run by Service Ice and Cold Storage, Inc. (now called Terminal). Fifty percent of the stock in Service Ice was owned by Alex Kenter, president of Service Ice, and Joe Kenter, secretary of Service Ice. The remaining 50 percent of the stock was owned by various members of the Rich family. Though the record is unclear on the following point, it appears that the Rich family controlled Terminal. Martin Rich was secretary-treasurer of Terminal and an active participant in the day-to-day management of the company. Prior to 1962, the primary customer of Service Ice was Rock Island Produce Company, owned and operated by the Kenters in partnership with the Rich family. Produce ran the egg-breaking operation which Roberts later conducted. Sometime during 1962, the Rich family withdrew from the partnership of Produce. In 1963 Produce went bankrupt and Service Ice lost this vital account. Service Ice was having financial difficulty and needed a source of revenue comparable to the Produce account to stay in business. To that end, Alex Kenter, president of Service Ice, contacted Robert Versman concerning the possible reorganization of the egg-breaking operation that Produce had conducted. Kenter was to manage the business and Versman would supply the necessary capital. The defendant, Roberts, was formed to take over Produce's operations and negotiations were conducted leading to the disputed contract. During negotiations, Martin Rich, secretary-treasurer of plaintiff, was contacted individually by Robert Versman and Alex

Kenter and was aware that Versman planned to enter the egg-breaking operation. The egg-breaking machinery was available by lease only from Seymour Foods and certain members of the Rich family were guarantors of the original lease between Seymour and Produce. Before Seymour would enter a lease with Roberts, Roberts was required to pay rental arrearages of about $5,000 on the original lease, thereby relieving the members of the Rich family from their guarantee of this amount. During negotiations, Robert Versman was never informed by either Martin Rich or Alex Kenter about the Rich guarantee of the lease. The document in dispute purports to be a contract between Service Ice and Cold Storage, Inc., and Roberts Frozen Foods, Inc. The document is executed for Roberts by R. H. Versman, as president of Roberts, and for Service Ice by Alex Kenter, without designation of any official capacity. Joe Kenter, with a designation of his official capacity as corporate secretary, properly attested the contract. The signed document was itself undated but incorporated an attached memorandum dated March 4, 1964, which set forth the services and rates contemplated during negotiations. By its terms, the contract was for a period of one year, "from the date herein" and was to be renewable each year for 10 years unless 30 days' notice of termination was given by Roberts at the end of the year.

Numerous issues are present concerning the disputed contract between Roberts and Service Ice. Plaintiff contends the trial court was correct in holding that the contract did not comply with the statute of frauds. We need not decide the question of whether under the present facts the requirements of the statute of frauds were met.

■■ The Illinois Civil Practice Act requires that all affirmative defenses, such as the statute of frauds, must be specifically pleaded. (Ill. Rev. Stat. 1975, ch. 110, par. 43(4).) Failure to specifically plead the statute of frauds constitutes a waiver of the statute as a defense, even though the defense may appear to be within the evidence. (*Economy Truck Sales & Service, Inc. v. Granger*, 61 Ill. App. 2d 111, 209 N.E.2d 1.) Terminal's failure to assert the statute as a defense to Roberts' counterclaim constitutes such a waiver. Once plaintiff had waived the defense of the statute by its failure to specifically plead it, the trial court was foreclosed from considering the defense of the statute *sua sponte*, even if the evidence suggested the existence of the defense. Plaintiff contends that its general denial of the contract was sufficient to raise the statute of frauds. We fail to see how a general denial of the existence of the contract can comply with the requirements of section 43(4) that the statute of frauds must be specifically pleaded. At best such a general denial would challenge the legal sufficiency of each of the essential elements of a contract. The trial court's determination that the statute of frauds had not been met was based upon an erroneous supposition of

what issues were presented by the pleadings. The case of *Kohlbrecher v. Guettermann*, 329 Ill. 246, 160 N.E. 142, cited by plaintiff was decided under general common law rules and it is clearly not applicable to a case arising under the Civil Practice Act. By holding that the defense of the statute of frauds was not properly raised we do not intend to imply that the contract did violate the statute, but since we are not considering the issue on the merits, any further discussion concerning the statute of frauds is unnecessary.

■■  Terminal contends that the contract can not be binding on it since Terminal's name does not appear on the contract. Defendant argues that Terminal and Service Ice are one and the same corporation, with only a change of name taking place. As proof thereof, defendant claims that certain statements contained in the interrogatories and testimony constituted admissions and when coupled with Terminal's failure to specifically raise the point in the pleadings, have established that Service Ice merely changed its name to Terminal.

In answer to one of defendant's interrogatories, Martin Rich, secretary-treasurer and manager of Terminal, stated:

> "The agreement to which the interrogatory probably refers is a guarantee given 19 January 1961 by Lewis Rich and Ida Rich to First Trust & Savings Bank covering the liabilities of Terminal Freezer, Inc., formerly Service Ice & Cold Storage, Inc., a copy of which agreement is attached hereto. * * * There is a security agreement in standard form from Service Ice to First Trust covering all property of Service Ice which secured the loan mentioned in the Vinyard letter attached."

Defendant also propounded the following interrogatory:

> "Would you give the date of the purchase of the stock of the plaintiff corporation by the present management from Alex Kenter and his brother Joe Kenter?"

Martin Rich answered on behalf of Terminal:

> "One-half of the stock was acquired 23 November 1960 and the other half was acquired 9 February 1966 from Frederick P. Patton, Trustee in Bankruptcy for Alex Kenter and Joe Kenter."

The record establishes that the stock Mr. Rich is referring to was actually stock in Service Ice and not stock in Terminal Freezers. Terminal's bookkeeper stated during her testimony that she had answered the phone "Terminal Freezers, Inc., formerly Service Ice." Martin Rich during cross-examination stated:

> "I became secretary-treasurer of Terminal Freezers. Prior to my coming in, Alex Kenter and Joe Kenter were principals of this company."

Alex and Joe Kenter were never officers of Terminal Freezers but were

officers of Service. The record is devoid of further evidence establishing the precise nature of the change in corporate structure, whether by merger, consolidation, or transfer of assets. However, upon the facts previously set forth we are compelled to find that Terminal Freezers succeeded to the obligations and benefits of the Service Ice contract with Roberts and that only a change of name took place between the two corporations. It would have been simple for Terminal to show that Service Ice was not the same corporation as Terminal. Yet, no probative evidence was introduced at trial which would establish the separate and distinct character of these two corporations. Indeed, we find little if anything in the pleadings which would indicate that the parties considered this an issue, but rather the pleadings are primarily directed to the merits of the case.

■■ Prior to the signing of the contract, Alex Kenter, president of Service Ice, had agreed to act as general manager of Roberts. Plaintiff contends this earlier employment commitment constituted an adverse interest on the part of Alex Kenter, and that this was known to Robert Versman prior to the signing of the contract. Plaintiff concludes as a result of the foregoing that neither Service Ice nor Terminal are bound on the contract. As a general rule, a corporation is not bound by the acts of an officer who maintains an interest adverse to the corporation when the party with whom the officer dealt had knowledge of the officer's conflicting interest. (*Culhane v. Swords Co.*, 281 Ill. App. 185.) We agree with plaintiff that Alex Kenter's employment commitment with Roberts constituted an adverse interest that deprived Terminal of the impartial business judgment that it was entitled to receive from its president. However, plaintiff fails to recognize that the general rule previously stated is limited by the principles of ratification.

The record establishes that various shareholders of Terminal, a close held corporation, were legally responsible as guarantors for over $5,000 in arrearages on the lease of the Seymour egg-breaking machine. Versman was never informed of this fact but was only told by the Kenters that this arrearage would have to be paid before Seymour would agree to an assignment of this vital lease. When Versman contacted two shareholders from the Rich family during negotiations concerning the prospects of the egg-breaking business, both remained silent as to the existence of this personal obligation of other shareholders in this close held corporation, while at the same time encouraging Versman to invest in the business. Martin Rich, secretary-treasurer of plaintiff, testified he had met individually both with Kenter and Versman concerning the proposed business and that he was also aware of the contract negotiations between Kenter and Versman. Inventory records established that business was commenced on about March 5, 1964. At the actual assignment of the

Seymour lease in the latter part of the same month, no statements were made concerning the Richs' guarantee. The record also establishes that Service Ice, later Terminal Freezers, was in financial difficulty and that without Roberts' entry into the egg-breaking business, Service Ice would probably fail. After Alex Kenter resigned from Service Ice on April 10, 1964, the incoming manager of Service Ice, Martin Rich, continued the day-to-day operation without any type of repudiation or disaffirmation of the agreement between Roberts and Service Ice, an agreement he certainly was aware of since he had been involved in the earlier negotiations. As a result of Mr. Rich's actions and his own statements, it is inconceivable that he was unaware of the existence of the contract. Nevertheless, Terminal continued to receive the benefits of the contract, not the least of which was a customer account of sufficient magnitude to allow it to stay in business.

■■ Illinois courts have consistently taken the position that a ratification may be found when a corporation, with knowledge of the material facts of the improper transaction, retains and enjoys the benefits of the transaction. (*George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.*, 12 Ill. App. 3d 362, 299 N.E.2d 601.) The ratification of a transaction need not be express, but it may be implied from the conduct of the parties. (*American Car & Foundry Co. v. Industrial Com.*, 335 Ill. 322, 167 N.E. 80.) By acquiescing in a course of conduct which rejected the purported nonexistence of the contract and by retaining the benefits of that contract, plaintiff has ratified the actions of its agent, even though the agent possessed an adverse interest.

■■ Plaintiff also contends that Kenter had no authority to sign the contract by virtue of his removal from his position as president several months before the signing of the contract. The only evidence offered by plaintiff in support was a letter dated February, 1964, telling Kenter of his removal from office. At this time Kenter owned 50 percent of the stock in Service Ice. No evidence, such as the corporate minutes, was offered to show the manner in which the removal of Kenter was accomplished. Such lack of documentary evidence when coupled with Kenter's resignation after the signing of the contract is fatal to plaintiff's contention. The existence of Kenter's actual authority eliminates any question concerning Kenter's apparent authority. Our determination that a valid contract was formed necessitates an inquiry into the legal effect of events which transpired subsequent to the formation of the contract.

From the inception of Roberts' entry into the egg-breaking business, Alex Kenter was to manage Roberts' operation. Robert Versman, who with his wife owned all of the stock of Roberts, intrusted every aspect of the operation of Roberts to Kenter. Versman admitted that he was only financing the operation and he relied completely on Kenter's experience

and business acumen to make a success of the venture. Shortly after Kenter resigned in April, 1964, to become employed exclusively as Roberts' general managing officer and Martin Rich became managing officer of Terminal, Terminal's charges for services began to vary from those specified in the contract. From the time the higher charges were billed to Roberts, the vast majority of them were paid by Roberts with the approval of its managing officer, Kenter. On December 9, 1964, Versman himself protested to the improper invoice charges.

■■ We find no Illinois cases which deal precisely with the authority of a general manager of a business, owned and operated by a close held corporation, to vary the terms of a written contract, which has been properly executed by an officer of the corporation. The general manager of a business has the implied authority to do all things necessary and proper to carry on the business in the usual and accustomed way. (*Hodges v. Bankers Surety Co.*, 152 Ill. App. 372.) When a general manager is intrusted by officers of a close held corporation with the complete operation of the corporation's sole business, the corporation will be bound by his acts in furtherance of the corporate business. It is undisputed that Robert Versman abdicated his duty as president of the defendant and allowed Alex Kenter unbridled discretion in the operation of Roberts. Kenter, as a general manager vested with this decree of responsibility, had the implied authority to vary the terms of any corporate contract, whether the contract was executed by himself or by a corporate officer. Therefore Kenter's approval of the invoices from Terminal was sufficient to modify the written contract and incorporate the higher rates as new terms of the contract. The contract was a comprehensive document which governed every possible aspect of the relations between the parties. Robert Versman protested on December 9, 1964, to all charges at variance with the contract. Since the basis for our decision is that the contract was modified by Terminal's billing and Roberts' assent to the higher charges contained in the invoices, we believe Versman's protest was sufficient to preserve Roberts' rights as specified in the contract as to any purported modifications occurring subsequent to the December 9 protest. Only those items which had previously been billed, approved, and paid without protest at the higher rate, are sufficiently established by the parties' conduct as to justify them as modifications to the contract. Any invoice billed after the December 9 protest must be in accord with the contract as altered by the earlier modifications.

■■ Defendant's arguments concerning the legal insufficiency of the contract modifications may be summarily treated. Defendant's first contention is that no consideration exists for the modification. Generally, a contract modification must be supported by consideration to be valid.

(*Schweickhardt v. Chessen*, 329 Ill. 637, 161 N.E. 118.) However, the case of *Snow v. Griesheimer*, 220 Ill. 106, 77 N.E. 110, established that a contract modification which has been executed will not be disturbed by the court even in the absence of consideration. We are of the opinion that *Snow* is sufficient authority to dispense with any further inquiry into the issue of consideration, though we do not intend to imply that consideration for the modification was in fact lacking. We also find that Terminal's invoices and Roberts' checks are sufficient writings to fulfill the requirements of the statute of frauds for modifications of written agreements within that statute.

As to those items of the counterclaim sounding in tort, we find no disagreement with the trial court's decision. The trial court's decision as to the invalidity or unenforceability of the Roberts' contract is reversed. However, because of the summary disposition by the trial court of the defendant's counterclaims under the contract and the nature of our own decision, we must remand the case for further proceedings not inconsistent with the views expressed herein.

Judgment reversed and remanded.

ALLOY, P. J., and BARRY, J., concur.