**METRO COMMUNICATIONS COM-PANY and Royal Radio Sales & Service, Inc., Plaintiffs,**

v.

**AMERITECH MOBILE COMMUNICATIONS, INC., Defendant.**

**No. 90–CV–70184–DT.**

United States District Court, E.D. Michigan, S.D.

Feb. 19, 1992.

Irwin M. Alterman, Charles Gerlach, Birmingham, Mich., for plaintiffs.

Kenneth J. McIntyre, Robert W. Powell, Detroit, Mich., for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### INTRODUCTION

This matter is before the Court on Defendant's February 15, 1991 motion for summary judgment. In this motion, Defendant argues, in major part, that an implied covenant of good faith does not limit its right unconditionally to contract with Plaintiffs' competitors. Oral argument was heard on January 30, 1992.

### FACTS

The following facts are undisputed.[1] Plaintiffs Metro Communications Company ("Metro"), Royal Radio Sales & Service, Inc. ("Royal"), and Henderson Glass, Inc. ("Henderson") are Michigan corporations engaged in the retail marketing of cellular telephone service and equipment in the Detroit area. Metro is a one store operation located in Redford, Michigan. Peter Siavrakas ("Siavrakas") is Metro's president, and Charles Belchunas ("Belchunas") is secretary-treasurer and 50% shareholder.

---

1. The factual statement below represents the facts as alleged by the Plaintiffs in their Amended Complaint and the Defendant in its motion for summary judgment. The Defendant's recitation of facts was generally not disputed by the Plaintiffs in their Brief Opposing Defendant's Summary Judgment Motion. However, where Plaintiffs' representation of the facts differs from that of Defendant, the Court will rely on Plaintiffs' version. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (for purposes of the summary judgment motion, non-movant's version of the facts must be believed, and all justifiable inferences are to be drawn in his favor).

Metro entered into a three year agency contract with Defendant on April 1, 1985 and a five year contract on November 1, 1988.

Royal is a one store appliance and electronics dealer in Royal Oak, Michigan. The cellular phone section of Royal was managed by Ben Bennett ("Bennett"). Royal entered into an agency contract with Defendant on August 5, 1985, a new agency contract on November 30, 1987, and its current five year agency contract on January 1, 1990.

Henderson is primarily in the business of selling replacement parts and auto glass to insured car owners whose cars were damaged or vandalized. It has 21 locations but no retail walk-in trade. Henderson's president is Carl Ostdiek ("Ostdiek") and its vice president, and the person in charge of the cellular phone business, is Louis Wall ("Wall"). Henderson entered into its first agency contract with Defendant on September 9, 1986. This contract was extended periodically until Henderson entered into a five year contract on January 1, 1990.

Defendant Ameritech Mobile Communications, Inc. ("AMCI") is a provider of cellular telephone service and equipment. AMCI has agency agreements with Plaintiffs and other agents and retailers [2] of cellular telephone service and equipment.

Pursuant to the terms of the agency agreements, Plaintiffs are required to meet certain annual quotas of new cellular telephone service subscriptions. The agreements also provide a graduated "ramping" payment schedule for payment of commissions to Plaintiffs based upon the number of cellular telephone lines activated each year after a "vesting" period.[3] The agreements also provide a formula for "residual" periodic payments for Plaintiffs' customer bases and "co-op" payments by AMCI for a portion of Plaintiffs' advertising fees.

Principals from Metro, Royal, and Henderson stated in their deposition testimony that they had read and understood their contracts. Siavrakas Dep. at 120, 132, 146–48, 150, 154, 349; Bennett Dep. at 62–63, 64, 99, 164–65; Ostdiek Dep. at 64–72, 189–90. Metro in 1988 and Henderson in 1986 and 1990 consulted with counsel who reviewed the contracts. Siavrakas Dep. at 338–39; Ostdiek Dep. at 64–65, 67–71, 358.

Plaintiffs also entered into equipment agreements with AMCI.[4] Under these agreements, Plaintiffs were required to purchase a minimum number of cellular telephones per year to obtain a favorable distributor price. The equipment agreements required Plaintiffs to maintain the same kind of facility, sales force, and solicitation of AMCI equipment as they were to provide under the agency agreements.

The core of Plaintiffs' Amended Complaint[5] concerns contracts between AMCI and various local agents and retailers.[6] On June 7, 1985, AMCI entered into a contract with Metrocell, a cellular telephone company. In April 1987, AMCI entered into an agency contract with Celluland of Michigan. Celluland was a franchisee of a California based franchisor unrelated to AMCI. Celluland was purchased by a subsidiary of AMCI in the spring of 1990 and now operates under the name CarFone Communications, Inc.

---

**2.** Both parties distinguish between "agents," smaller dealers, and "retailers," multi-store, multi-location dealers.

**3.** If a customer cancels service during the vesting period, Plaintiffs are not entitled to payment of commissions for that activation.

**4.** Metro's equipment agreement was with an affiliate of AMCI.

**5.** The original Complaint was filed on January 23, 1990. Henderson moved to intervene on October 31, 1990 and the Amended Complaint, in which Henderson was added as a Plaintiff, was filed on December 12, 1990.

**6.** In their Brief Opposing Defendant's Summary Judgment Motion ("Response"), the Plaintiffs claim that the "core of the complaint is that Ameritech entered into substantially more favorable contracts with Metrocell, another 5 Star Dealer, and with so-called 'authorized retailers,' discount chains ABC Warehouse, Fretter and Highland Appliance, in breach of its duty of good faith and fair dealing." Response at· 1.

On December 19, 1984, AMCI entered into a contract with Tandy Corporation. This was AMCI's first retail operation. The contract contains a definition of "retailer" which provides, in part, that a retailer should have "four (4) or more stores ... which stores sell predominantly and directly to the end consumer through employees working in the stores." In late 1987 and early 1988, AMCI enlisted certain multilocation, high volume retailers in the Detroit area to sell AMCI cellular service. ABC Appliance, Inc. was signed November 1, 1987, Fretter, Inc. was signed January 1, 1988, and Highland Superstores, Inc. was signed January 1, 1988.

## AMENDED COMPLAINT

Plaintiffs assert four separate claims in their Amended Complaint:

1. that AMCI breached an implied covenant of good faith and fair dealing by:

(a) refusing to pay agents the commission and other fees for corporate accounts [7],

(b) discriminating among agents in the annual "ramping" requirement and, on information and belief, on other material terms,

(c) entering into agreements with authorized retailers which:

(i) do not require these retailers to maintain installation and maintenance facilities or perform other obligations imposed on agents,

(ii) on information and belief, grant a more favorable commission, vesting,

advertising fund, and other economic terms, and

(iii) permit the retailers to sell cellular telephone equipment far below cost;

2. that AMCI modified the agency contract with Metro and thereby agreed that it would treat Metro "substantially equally with its other agents";

3. that AMCI, as principal, unreasonably interfered with Plaintiffs' performance of their duties as AMCI's agents by discriminating against them in the manner described in (1) above [8];

4. that the alleged discrimination described in (1) above constitutes a violation of Sections 2(a), (d), (e) of the Robinson–Patman Act, 15 U.S.C. 13(a), (d), (e).

## MOTION FOR SUMMARY JUDGMENT

In its motion for summary judgment, AMCI sets forth six major arguments:

I. Metro's and Royal's claims with respect to the alleged discrimination in favor of other agents and all Henderson's claims are barred by the contractual two year limitations period;

II. The implied covenant of good faith and fair dealing does not limit AMCI's right unconditionally to deal with other agents and retailers;

III. Metro's claim based on letters outside its contract is barred by the integration and modification clause of its contract.

IV. Plaintiffs' claims do not satisfy the elements of a Robinson–Patman Act violation.

---

7. According to the Amended Complaint, beginning in February 1986 AMCI instituted a new policy under which agents were precluded from soliciting business from corporate accounts. AMCI allegedly reserved these corporate accounts for itself. Amended Complaint at 14.

8. This claim asserts that the principal-agent relationship between AMCI and Plaintiffs obligated AMCI to refrain from discriminating against Plaintiffs. However, any duty of a principal towards his agent based on a contractual relationship must be contained, expressly or impliedly, by the contract establishing the agency. Restatement (Second) Agency § 432 ("A principal is subject to a duty to an agent to perform the contract which he has made with the

agent"); Restatement (Second) Agency, ch. 14, Introductory Note ("The relation of principal and agent is based upon the manifestation of consent by the parties and hence, unless the manifestations do not have legal effect, the duties of both parties are based upon them"). Therefore, the Court must examine the agency contracts to determine whether AMCI owed Plaintiffs the duty to compete with them on substantially equal terms. As the express language of the agency contracts do not establish such a duty, the Court must examine whether the implied terms of the contracts create this duty. This claim, then, is essentially a restatement of the implied good faith claim and will be treated as such by the Court.

V. Plaintiffs are barred from recovering lost profits and consequential damages.

VI. Metro's claims are barred by the limitations of remedies provisions of its 1988 agency contract.

The Court will first address the standard of review governing motions for summary judgment and will then address the above arguments seriatim.

## STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lower the movant's burden on a summary judgment motion.[9] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. The relevant principles can be summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the above principles to the following discussion.

## DISCUSSION

### I. CONTRACTUAL LIMITATIONS PERIOD

■ Plaintiffs' agency contracts contain a provision requiring that any cause of action under the contract be brought within two years after it has "arisen."[10] This provision reads:

---

9. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 29 (1991 Supp.).

10. The parties do not dispute that a contractual limitations period may supersede a statutory limitations period under Illinois law. *Shelton v. Country Mut. Ins. Co.*, 161 Ill.App.3d 652, 113 Ill.Dec. 426, 430, 515 N.E.2d 235, 239 (1987); *Board of Education v. Hartford Acci. and Indem.*

No action, except those regarding information, marks, copyrights, patents, processes, ideas, methods, or other proprietary property, regardless of form, arising out of this Agreement, may be brought by either party more than two years after the cause of action has arisen, or, in the cases of nonpayment, more than two years from the date the last payment was due.

Plaintiffs Metro and Royal filed the original Complaint on January 23, 1990. Henderson was added to the Amended Complaint which was filed on December 12, 1990. Therefore, the instant action would be time barred as to any contractual claim by Metro or Royal that accrued before January 23, 1988. It would be time barred as to any claim by Henderson that accrued before December 12, 1988.

The purpose of a limitations period is "to require the prosecution of a right of action within a reasonable time to prevent the loss or impairment of available evidence and to discourage delay in the bringing of claims." *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.,* 61 Ill.2d 129, 334 N.E.2d 160 (1975). The parties agree that Illinois applies the "discovery rule." [11] The discovery rule "postpones the starting of a limitation period until a plaintiff has knowledge or should have knowledge of the defendant's wrongful acts." *Withall v. Capitol Federal Sav.,* 155 Ill. App.3d 537, 108 Ill.Dec. 202, 205, 508 N.E.2d 363, 366, *later proceeding,* 164 Ill. App.3d 851, 115 Ill.Dec. 803, 518 N.E.2d 328 (1987), *appeal denied,* 119 Ill.2d 576, 119 Ill.Dec. 400, 522 N.E.2d 1259 (1988). AMCI explains that the requisite knowledge is not certainty but rather "knowledge that requires a potential plaintiff to investigate and ask whether he has a cause of action, that is, whether the defendant has committed an actionable wrong." *Pollock v. Hafner,* 108 Ill.App.3d 410, 64 Ill. Dec. 156, 158, 439 N.E.2d 85, 87 (1982).

As Plaintiffs' core complaint is that AMCI discriminated against them, the point of accrual is the time at which Plaintiffs knew, or should have known, that AMCI was discriminating against them. AMCI refers to several portions of Plaintiffs' deposition testimony to demonstrate Plaintiffs' knowledge. Metro's President, Siavrakas, states that he suspected as early as 1986 that AMCI was wrongfully discriminating against Metro:

Q. You concluded as early as 1986 that Ameritech was wrongfully discriminating against you in favor of other authorized agents, correct?

A. That is correct.

Q. And you did not commence suit concerning that discrimination until 1990 of this year, is that correct?

A. That is correct. The correction, I have to say, I am sorry, when you say concluded, I didn't confirm until sometime later. I was suspicious, very suspicious. That was the case.

Siavrakas Dep. at 132. Secretary–Treasurer Belchunas adds that in 1986 or 1987, Metro was talking about the possibility of suing AMCI. Belchunas Dep. at 44–45.

Bennett, Royal's vice president, indicates that he thought as early as 1986 AMCI was discriminating against Royal:

Q. When did you first start thinking that Ameritech was discriminating against you?

A. We had some inkling that something must be wrong as early as 1986.

Bennett Dep. at 101. He adds in the following exchange:

Q. Mr. Bennett, I believe you earlier testified that you first came to think that other authorized agents were receiving economic treatment that put you at a disadvantage sometime in 1986; correct?

A. Yes.

Bennett Dep. at 157.

Henderson's president engages in this exchange:

*Co.,* 152 Ill.App.3d 745, 105 Ill.Dec. 715, 504 N.E.2d 1000 (1987).

**11.** In its motion, Defendant argues that a contract claim accrues at the time the contract is breached, not when damage is discovered. However, in its reply, Defendant apparently discards this argument and agrees that the discovery rule applies.

Q. So it's possible that as early as November 1988 you were seeing these phones and you concluded that the retailers are obviously getting a better deal than you, right?

A. My suspicions were definitely peaked [sic] at that time.

Ostdiek Dep. at 292–94. Vice–President Wall says, "I do recall having conversations with either Mr. Adams or the Ameritech rep for Henderson who was Jack May at the time wherein I felt we were not being compensated at or at the same level as the other people were." Wall Dep. at 119–20.

Based on this testimony, AMCI claims that Plaintiffs had knowledge of alleged wrongful acts by AMCI and that this knowledge started the limitations period.

The Court finds AMCI's argument compelling. The above deposition testimony indicates that all three Plaintiffs believed that AMCI was discriminating against them more than two years prior to the filing of their action. While generally the determination of when a plaintiff knew or should have known of his injury is a question of fact under Illinois law, *Commonwealth Edison Co. v. Encompas, Inc.*, 158 Ill.App.3d 852, 110 Ill.Dec. 811, 814, 511 N.E.2d 988, 991 (1987), this case presents exceptional circumstances. Specifically, Plaintiffs' principals have admitted under oath that they knew they were being discriminated against more than two years before bringing their action. These admissions are sufficient for the Court to find, as a matter of law, that Plaintiffs' claims are time barred.

Plaintiffs assert several defenses to AMCI's limitations period argument. First, they claim that they only 'suspected' but did not 'know for a fact' that AMCI was engaging in discrimination. The deposition testimony cited by AMCI, however, reveals that Plaintiffs' principals were more than suspicious. They clearly knew that AMCI was favoring other agents with more favorable terms, and even discussed taking legal action in response.

Second, Plaintiffs argue that each time a Plaintiff entered into a contract with AMCI, the limitations period started anew. However, as indicated in a case cited by Plaintiffs, to restart the limitations period, there must be "a new and independent act that is not merely a reaffirmation of a previous act." *Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir.1987). Plaintiffs propose no new act which would have recommenced the limitations period from the first point of knowledge.

Third, Plaintiffs claim that the two year limitations period does not apply because AMCI "fraudulently concealed" the cause of action from Plaintiffs. However, Plaintiffs admit that the fraudulent concealment doctrine is not available to one who, with due diligence, could have discovered the existence of the cause of action. *Brunswick Corp. v. Riegel Textile Corp.*, 578 F.Supp. 893, 898 (N.D.Ill.1983), *aff'd*, 752 F.2d 261 (7th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). As explained above, the Court finds that the centerpiece of this action is breach of contract because of alleged discrimination and that Plaintiffs knew of this alleged discrimination at a point in time outside the limitations period.

Finally, Plaintiffs set forth the doctrine of equitable estoppel, claiming that AMCI misled Plaintiffs into forbearing suit until after the expiration of the limitations period. As will be discussed in more detail *infra*, however, the record is devoid of any evidence that AMCI made specific representations designed to deter Plaintiffs from bringing an action.

As the party seeking the benefit of rules in avoidance of statutes of limitations has the burden of proof to establish his entitlement to such rules, *Brunswick*, 578 F.Supp. at 897 (citing *Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230, 233 (6th Cir.), *cert. denied*, 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974)), and as Plaintiffs have failed to satisfy their burden in this instance, the Court will deny Plaintiffs' defenses to the limitations period claim.

Metro's and Royal's claims with respect to alleged discrimination in favor of competing agents (but not retailers) and all Henderson's claims are thus barred by the contractual limitations period.

## II. IMPLIED COVENANT OF GOOD FAITH

■ As the limitations period does not bar all Plaintiffs' contractual claims—and does not bar the Robinson–Patman Act claim at all—the Court will address Defendant's substantive arguments as well.

All parties appear to agree that the agency contracts between AMCI and each Plaintiff contain no express statement that AMCI must treat each of its agents in a substantially equal manner. However, Plaintiffs allege that there is an implied covenant of good faith and fair dealing underlying the explicit terms of the agency contracts.[12] This covenant, they say, limits AMCI's ability to establish significantly more favorable contractual terms with competing agents and retailers.[13]

AMCI has alleged, and Plaintiffs have not disputed, that the issue of "[w]hether a covenant of fair dealing can be implied is a question of law for the court to decide." *Snyder v. Howard Johnson's Motor Lodges, Inc.*, 412 F.Supp. 724, 727 (S.D.Ill. 1976).

Under Illinois law, the implied covenant attaches to every contract and "imposes a limitation on the exercise of discretion vested in one of the parties to a contract." *Dayan v. McDonalds Corp.*, 125 Ill.App.3d 972, 81 Ill.Dec. 156, 170, 466 N.E.2d 958, 972 (1984), *later proceeding,* 138 Ill.App.3d 367, 92 Ill.Dec. 945, 485 N.E.2d 1188 (1985).

Specifically, "a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* Illinois courts have clearly stated that the covenant is "not an enforceable legal duty to be nice or to behave decently in a general way." *Zick v. Verson Allsteel Press Co.*, 623 F.Supp. 927, 929 (N.D.Ill.1985), *summary judgment granted,* 644 F.Supp. 906 (N.D.Ill.1986), *aff'd without op,* 819 F.2d 1143 (7th Cir.1987). Rather, while the covenant may be used "as a construction aid in determining the parties' intent," it is not based on " 'vague notions of fair dealing.' " *Anderson v. Burton Assoc., Ltd.,* 218 Ill.App.3d 261, 161 Ill.Dec. 72, 76, 578 N.E.2d 199, 203 (1991) (citing *Martin v. Federal Life Ins. Co.,* 109 Ill.App.3d 596, 65 Ill.Dec. 143, 440 N.E.2d 998 (1982) and *Foster Enterprises v. Germania Fed. Sav.,* 97 Ill.App.3d 22, 52 Ill.Dec. 303, 421 N.E.2d 1375 (1981)).

In this case, the agency contracts explicitly grant AMCI the discretion to compete with Plaintiffs. The pertinent clause reads:

> During the term of this Agreement or thereafter, Ameritech Mobile reserves the right, without obligation or liability to Agent, to market CRS in the same area served by Agent, whether through Ameritech Mobile's own employees or through others, including other Agents and Resellers [or Retailers].[14]

Under *Dayan,* AMCI is therefore obligated by the implied covenant of good faith to compete in a reasonable and nonarbitrary

**12.** Restatement (Second) Contracts § 205 (1979) reads: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Comment a explains: "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."

**13.** The Plaintiffs allege in their Response:
Plaintiffs do not contend that all agents' contract terms had to be identical. Plaintiffs do claim, however, that there comes a point of dissimilarity at which the duty of good faith and fair dealing is breached because there

comes a point where the right to receive the fruits of the contract is substantially destroyed by the competitive dissimilarity and disadvantage.
Response at 17.

**14.** The 1990 Royal and Henderson contracts do not include the phrase "without obligation or liability to Agent," but are otherwise the same. The 1990 contracts do add a reference to AMCI's competition through "Retailers," which the earlier contracts did not. AMCI affiliated retailers did not compete in the Detroit area until 1988.

manner and in a manner which is consistent with the reasonable expectations of the parties. The specific issue, then, is whether the parties reasonably expected that AMCI would be able to grant substantially more favorable contract terms to Plaintiffs competitors.

AMCI claims that the right to compete clause explicitly permits AMCI to compete with Plaintiffs. This clause contains no limitation on the manner in which AMCI could compete with Plaintiffs. Therefore, the possibility that AMCI would offer more favorable terms to Plaintiffs' competitors was, or should have been, part of the parties' reasonable expectations. As such, there is no violation of the implied covenant of good faith.

Plaintiffs admit that the right to compete clause permits AMCI to compete with Plaintiffs. However, Plaintiffs claim that as the clause does not specify the *manner* in which AMCI would compete with Plaintiffs, it was reasonable for Plaintiffs to expect that AMCI would not compete with Plaintiffs in a fashion which would deny Plaintiffs the right effectively to compete with AMCI.[15] Therefore, when AMCI betrayed Plaintiffs' reasonable expectations under the contracts, it necessarily breached the implied covenant of good faith.

The dispositive issue is whether the Plaintiffs reasonably expected (or should have reasonably expected) that they would be subject to unrestricted competition.

A review of the plain language of the right to compete clause, coupled with deposition testimony of Plaintiffs' principals, convinces the Court that Plaintiffs should have expected that AMCI was granted an *unrestricted* right to compete with Plaintiffs. The clause reads, in relevant part: "Ameritech Mobile reserves the right ...

to market CRS in the same area served by Agent." Initially, the Court observes that the clause is an affirmative grant of power. The right to market is not mitigated or modified by any language. Thus, nothing on the face of the clause limits the manner in which AMCI was permitted to market its cellular telephone service. Absent language suggesting an intent to limit the extent of the right to market, the Court is loathe to read into the clause an unintended restriction.

Strengthening this interpretation of the clause is deposition testimony in which principals of Plaintiffs admit that they were aware that AMCI had an unrestricted right to compete. Siavrakas, of Metro, understood that AMCI could successfully compete against it. Siavrakas Dep. at 149–50. Bennett, of Royal, admitted that he knew when he entered into the 1985 agency contract that AMCI could have undersold him, but that this was one of the business risks that he took. Bennett Dep. at 76–77. Ostdiek, of Henderson, knew before entering into its 1990 agency contract that AMCI offered different terms to different AMCI agents and retailers. Ostdiek Dep. at 176–79; 186–88. Based on these admissions, AMCI asserts that Plaintiffs had a reasonable expectation when they entered into the agency contracts that AMCI might negotiate different terms with Plaintiffs' competitors.

Therefore, the Court rejects Plaintiffs attempt to limit the clear language of the contract through the implied covenant of good faith. In essence, Plaintiffs are attempting to read an implied restricted competition clause into an express right to compete clause.[16] *See Patel v. Dunkin' Donuts of America, Inc.,* 146 Ill.App.3d 233, 100 Ill.Dec. 94, 96, 496 N.E.2d 1159, 1161 (1986) ("Contrary to plaintiffs' argument,

---

**15.** Plaintiffs say:
   The central point is that there were important express areas of discretion under the contracts themselves and *reasonable expectations that plaintiffs would be treated substantially fairly and equally, so that, having made considerable long term economic investments so to perform their obligations under the contracts, plaintiffs could effectively compete.*
Response at 17 (emphasis added).

**16.** If the Court were to hold that the instant contracts contain an implied restriction on competition, it would be placed in the unenviable position of having to delineate for the parties the boundaries of "fair" competition—that which guarantees to Plaintiffs the fruits of their contracts—and "unfair" competition—that which deprives Plaintiffs of the fruits of their contracts.

they, in reality, are attempting to insert an exclusive territory clause into the franchise agreement"). However, Plaintiffs signed their contracts knowing that they risked competition from AMCI and other AMCI agents. This was a risk that they chose to assume. Their contracts having turned sour, they now wish to utilize the Court to avoid the consequences of their choices. It is not, however, the role of the judiciary to rewrite business contracts.

In a recent decision by Illinois court of appeals, *Continental Mobile Telephone Co. v. Chicago SMSA Limited Partnership*, 225 Ill.App.3d 317, 167 Ill.Dec. 554, 587 N.E.2d 1169 (1992), the court discussed the question whether the implied covenant of good faith and fair dealing applied in the context of a contract for the supply of cellular telephone service. Plaintiff, a dealer in cellular telephone service, entered into a contract with defendant, the operator of a cellular telephone transmission system, specifying the rates which defendant would charge plaintiff for use of its services. The contract specified, in relevant part:

> The Company [defendant], at its sole discretion and at any time, reserves the right to revise its rates and charges. The Company shall provide thirty (30) days notice to the Customer [plaintiff] of the effective date of any revision.

*Id.*, 225 Ill.App.3d 321–22, 167 Ill.Dec. at 557, 587 N.E.2d at 1172. In response to plaintiff's claim that defendant breached an implied covenant of good faith and fair dealing by withholding from plaintiff a favorable rate, the court said:

> Good faith between contracting parties requires that a party vested with contractual discretion must exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. In this case, both parties were aware that defendant was able to raise its wholesale rates at any time, thereby negating any inference that defendant's actions were outside the contemplation of

the parties and could be characterized as a breach of good faith.

*Id.*, 225 Ill.App.3d 323–25, 167 Ill.Dec. at 559, 587 N.E.2d at 1174 (citations omitted). This language indicates that the Illinois courts will not apply the implied covenant of good faith where the alleged violation was within the purview of the contractual terms.[17]

In *Patel, supra*, the plaintiff and defendant entered into a franchise agreement providing plaintiff with a donut shop. The agreement reserved to the defendant the right to operate or franchise other donut shops on such terms as defendant deemed reasonable. The agreement stated:

> DUNKIN' DONUTS, in its sole discretion, has the right to operate or franchise other DUNKIN' DONUTS SHOPS under, and to grant other licenses in, and to, any or all of the PROPRIETARY MARKS, in each case on such terms and conditions as DUNKIN' DONUTS deems acceptable.

*Id.*, 100 Ill.Dec. at 94, 496 N.E.2d at 1159. Plaintiff admitted that the agreement lacked an exclusive territory provision but claimed that the covenant of good faith and fair dealing prohibited the defendant from franchising another location in such close proximity that it "den[ied] Plaintiffs the fruits of their franchise agreement" and "would result in injury to Plaintiffs' business and future profits." *Id.*, 100 Ill.Dec. at 95, 496 N.E.2d at 1160.

The Illinois court of appeals refused to apply the covenant of good faith and fair dealing to limit the noncontractual activities of the defendant when the agreement explicitly reserved those activities to defendant:

> Plaintiffs' ... franchise agreement contains no geographical or time restraints regarding the establishment of another Dunkin' Donuts franchise. In fact, the agreement expressly grants one location to Plaintiffs and reserves, without restriction, defendants' right to operate or

---

17. The Court observes that plaintiff has filed a petition of rehearing on the good faith and fair dealing claim. However, even if the Illinois court of appeals were to reconsider its decision, this Court's interpretation of the status under Illinois law of implied covenants of good faith and fair dealing would not be affected.

franchise other shops on such terms as defendants deem appropriate. Rather than giving any proprietary rights in other locations, the agreement rejects such rights. Rather than restricting defendants' establishment of Dunkin' Donuts shops within defined geographical and chronological limits, the agreement authorizes defendants' unrestricted competition.

*Id.*, 100 Ill.Dec. at 96, 496 N.E.2d at 1161.

Although it applied New York State law, a 1989 decision by the United States District Court for the District of Minnesota is similarly on point. In that case, ice cream parlour franchisees of Haagen–Dazs ice cream brought suit against the franchisors, manufacturers, and distributors. The relevant allegation in that case was that the franchisor competed against its franchisees through the distribution of prepackaged pints in nonfranchised retail outlets: "Plaintiffs claim that defendants sold products to nonfranchised retail outlets 'at substantially more favorable economic terms' than to franchisees." *Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 805 (D.Minn.1989). As in the instant case, the franchise agreement reserved to the franchisor the right to compete:

> Franchisee acknowledges and agrees that the Franchisor and the Haagen–Dazs trademark owner has the right and may distribute products identified by the Haagen–Dazs trademarks through *not only Haagen–Dazs shoppes but through any other distribution method which may from time to time be established.*

*Id.* at 818. In light of this language, the court found no express contractual violation. The court, citing *Patel*, similarly rejected the plaintiffs' implied covenant of good faith and fair dealing claim:

> Looked at in the light most favorable to the plaintiffs, the evidence suggests that HDC may have focused on increasing the sales of prepackaged pints at the expense of franchise sales. It also suggests that HDSC was at best ineffective at, or at worst unconcerned about, taking measures to counter the effects of pre-

packaged pint sales on the franchisees. This does not, however, amount to a breach of the implied covenant of good faith and fair dealing. *That covenant serves "in aid and furtherance of other terms of the agreement of the parties." It does not create independent substantive rights or create rights inconsistent with those explicitly set out in the contract.* In this case, the franchisor and its parent companies explicitly reserved the right to distribute Haagen–Dazs ice cream by any method. That language gives Haagen–Dazs the right to aggressively distribute prepackaged pints, even though that distribution adversely affects retail sales by franchisees.

*Id.* at 818–19 (citations omitted) (emphasis added). Thus, in *Carlock*, the court found that the implied covenant could be used to elucidate the express terms of the contract but not to create an independent right.

Similarly, Illinois law treats an implied covenant "as a construction aid in determining the parties' intent," *Anderson*, 161 Ill.Dec. at 76, 578 N.E.2d at 203, but not as the source of an independent right. As such, the implied covenant of good faith and fair dealing may not be used to contravene explicit contract terms negotiated by the parties. The clear and unambiguous language of the agency contracts in this case permits unrestricted competition. The Court refuses to undermine this clear language through the invocation of an inchoate good faith requirement.

## III. INTEGRATION AND MODIFICATION CLAUSE

### A. *Written Representations* [18]

██ In the Second Claim, Metro alleges that AMCI modified the agency contracts and expressly obligated itself to treat Metro and other agents in a substantially equal manner. Amended Complaint at 19. Metro relies on letters from AMCI which allegedly constitute written representations that AMCI would treat all its agents in a substantially similar fashion. A 1987 letter from Regional General Manager Thomas

---

**18.** This section of the Opinion concerns only Metro.

Adams says that "[i]t is the intent of Ameritech Mobile Communications and myself, as Regional General Manager, to apply the Terms and Conditions of the Authorized Agent Agreement equally and equitably as they apply to each Agent in the Detroit market place." Exhibit 135. A 1988 letter from President Richard Notebaert ("Notebaert") says that "Each distribution channel in each of our markets, and each individual company within that channel is treated in a substantially similar fashion as to the principal terms and conditions under which we do business." Plaintiffs' Exhibit 2. A 1989 Notebaert letter says that "I want to again reiterate, as I have made clear to you in the past and in my September 28, 1988 letter to you, that it is Ameritech Mobile's policy to treat all of its agents in a fair and substantially similar fashion." Exhibit 123. Before signing its 1988 agency contract with AMCI, Metro requested that Notebaert's September 28, 1988 letter be made part of the contract. AMCI refused. Exhibit 143. Nevertheless, Metro signed the contract.

AMCI challenges Metro's contract modification argument. It says that in Illinois contract modifications are governed by the same rules as other contracts and thus require offer, acceptance, and consideration. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 208 (7th Cir.1985), *later proceeding*, 801 F.2d 908 (7th Cir.1986); *Gorman Publishing Co. v. Stillman*, 516 F.Supp. 98, 108 (N.D.Ill.1980); *Scutt v. La Salle County Bd.*, 97 Ill.App.3d 181, 53 Ill.Dec. 21, 24, 423 N.E.2d 213, 216 (1981). The parties must express their mutual consent to the same terms, *MAJS Invest., Inc. v. Albany Bank & Trust Co.*, 175 Ill.App.3d 478, 124 Ill.Dec. 918, 920, 529 N.E.2d 1035, 1037 (1988), and the assent must be supported by consideration, *Terminal Freezers, Inc. v. Roberts Frozen Foods, Inc.*, 41 Ill. App.3d 981, 354 N.E.2d 904, 910 (1976). There is no indication that either party regarded these letters as modifying the agency contracts. The record fails to reveal either mutual assent to the same terms or consideration for any alleged promise in the letters. In fact, as noted above, when Metro asked to incorporate the September 1988 letter into its contract, AMCI refused.

Metro admits that there was no express assent but relies on promissory estoppel to create a binding promise. Restatement (Second) Contracts § 90(1) says in relevant part:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only be enforcement of the promise.

Metro claims that statements by AMCI that all agents were being treated equally were made with the intent to induce Metro to forbear from suing AMCI. Response at 25. Metro refers to two cases, *United Factors Div. of United Merchants & Mfrs., Inc. v. Murphy*, 345 F.Supp. 768 (N.D.Ill. 1971) and *Redarowicz v. Ohlendorf*, 95 Ill. App.3d 444, 50 Ill.Dec. 892, 420 N.E.2d 209 (1981), *aff'd in part and rev'd in part*, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982), for the proposition that reliance by forbearance from suit is sufficient consideration to support a promise.

In both referenced cases, suits were relinquished in direct consideration for express promises. *United Factors Div.*, 345 F.Supp. at 770; *Redarowicz*, 420 N.E.2d at 212. In this case, however, neither the letters nor deposition testimony indicates that AMCI reasonably thought the letters would induce Metro to forbear bringing an action or that they did indeed have this effect. In fact there is no evidence outside Metro's unsupported statement that these letters were meant to induce Metro to forbear from bringing suit.

### B. Oral Representations

To the extent the Plaintiffs rely on alleged oral representations that all agents would be treated substantially equally, these representations do not modify the written agency contracts. Though oral modifications are, in principle, permitted, *Monarch Coaches, Inc. v. ITT Indus. Credit*, 818 F.2d 11, 12 (7th Cir.1987), they

are proscribed when a contract contains an integration clause. *Shea v. Preservation Chicago, Inc.*, 206 Ill.App.3d 657, 151 Ill. Dec. 749, 756, 565 N.E.2d 20, 27 (1990); *North Broadway Motors, Inc. v. Fiat Motors of North America, Inc.*, 622 F.Supp. 466 (N.D.Ill.1984). In this case, the agency contracts all contain an integration clause which reads:

> The entire agreement between the parties is incorporated in this Agreement and it supersedes and merges all prior discussions and agreements between the parties relating to the subject matter hereof. This Agreement can be modified only by a written amendment duly signed by persons authorized to sign agreements on behalf of Ameritech Mobile and Agent and shall not be supplemented or modified by any course of dealing or trade usage.

■ Plaintiffs argue that parol modifications may add consistent terms to a contract where a contract is incomplete. As the instant contracts say that AMCI may compete but do not say *on what terms* it may compete, say Plaintiffs, parol modification is permissible to clarify the manner of competition, i.e., substantially equal.

As explained above, however, the right to compete clause leaves no room for interpretation. Rather, it grants AMCI the unrestricted right to compete. Therefore, there is no room for supplemental contractual terms. Even if the contracts were incomplete, however, parol modification is limited to *consistent* terms. The superimposition of a restricted competition rider onto a right to compete clause reflects limitation through inconsistent terms rather than addition through consistent terms.

## IV. ROBINSON–PATMAN ACT [19]

■ Plaintiffs contend that AMCI has violated Sections 13(a), (d) and (e) of the Robinson–Patman Act, 15 U.S.C. 13(a), (d) and (e). Briefly stated, those sections of the Act make it unlawful for any person engaged in commerce to discriminate in price between different purchasers of commodities of like grade and quality.

AMCI contends that Plaintiffs have not stated a claim under the Robinson–Patman Act because the Act only applies to the sale of *commodities*, i.e., tangible goods. AMCI argues that Plaintiffs' allegations refer only to alleged discrimination in economic benefits paid for enlisting subscribers for cellular telephone *service*, a nontangible item not covered by the Act. AMCI further argues that the alleged discrimination is not actionable under the Act because Plaintiffs are AMCI's agents, and, hence, there was no *sale* of anything to them; Plaintiffs merely acted as "middlemen" in selling a service directly from Ameritech to retail customers.

Plaintiffs concede that when a product is merely a service, it is not covered by the Act. However, they argue that the provision of cellular telephone service in this case is so interrelated with the sale of cellular telephone equipment that it falls within the Act's coverage.

■ To determine whether the Robinson–Patman Act is implicated when a transaction involves both the sale of tangible goods and the provision of a service, a court must first determine the "dominant nature" of the transaction. The dominant nature examination was first undertaken in *General Shale Products Corp. v. Struck Const. Co.*, 132 F.2d 425 (6th Cir.1942), *cert. denied*, 318 U.S. 780, 63 S.Ct. 857, 87 L.Ed. 1148 (1943). In that case, the Sixth Circuit determined that a construction contract did not include a sale of commodities within the meaning of the Robinson–Patman Act even though the contract listed separately the cost of the bricks and other tangible items to be supplied. Similarly, in *First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1035 (7th Cir.1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1123, 107 L.Ed.2d 1030 (1990), the Seventh Circuit concluded that a printing contract did not implicate the Robinson–Patman Act even though the contract involved the purchase of supplies and the end product of

---

**19.** The initial portion of this section is derived from the Court's August 23, 1990 Memorandum

Opinion and Order denying Defendant's Motion to Dismiss.

the printing—comic books—was indisputably a commodity within the meaning of the Act.

■ The problem with Plaintiffs' argument is that it misapplies the dominant nature test to the circumstances in this case. The dominant nature analysis is only applicable when *one transaction* has both a "service" facet and a "commodity" facet. In such cases, the two aspects of the transaction are clearly related and a court must determine which is dominant. For example, in *SCM Corporation v. Xerox Corporation*, 394 F.Supp. 384 (D.Conn.1975), a customer who leased a copying machine from Xerox and paid charges based on the number of documents copied, sued Xerox under the Robinson–Patman Act. The court had to determine whether the customer was leasing the ability to make a copy (service) or purchasing the copies (commodity). The court held that the contract was for a service and not a commodity. "What he obtains from Xerox is the process that transforms the plain piece of paper into one bearing images of the item to be copied." *Id.* at 386. In this case—as with most cases examining this issue—the contract, on its face, encompassed both goods and services. *See First Comics, supra* (color printing service distinct from the actual comic book); *Rankin County Cablevision v. Pearl River Valley Water Supply Dist.*, 692 F.Supp. 691 (S.D.Miss. 1988) (cable service distinct from the tangible machinery used to transmit electronic impulse).

Unlike *SCM Corporation*, the instant case does not involve one transaction with bipartite aspects. Rather, here the transaction involving the supply of telephones was wholly separate from the transaction involving the supply of the activation service. There is no requirement that a dealer enter into an equipment agreement to be party to an agency agreement, or vice versa. Moreover, Plaintiffs sell phones to customers without activation and vice versa. Bennett Dep. at 143–45; Siavrakas Dep. at 217–22.

■ More important, the Act has no application to transactions that are not sales. *Parrish v. Cox*, 586 F.2d 9, 12 (6th Cir.1978). Plaintiffs do not "buy" cellular phone service from AMCI. Rather, they act as intermediaries between AMCI (seller) and the customer (buyer). As they do not "buy" the cellular telephone service, there can be no "sale." *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367 (3d Cir.1985) ("Preferences granted to a legitimate sales agent are not actionable [under Robinson–Patman Act] because there is not sale to the agent"). As there is no sale, there can be no violation. Therefore, Plaintiffs' claim that AMCI violated the Act by discriminating "among Detroit area agents in the fees paid by AMCI for activations" must fail.

## CONCLUSION

In sum, AMCI has met its burden of demonstrating to the Court that each of Plaintiffs' claims lacks a genuine issue of material fact. The Court finds as a matter of law that AMCI did not breach an implied covenant of good faith and fair dealing. Under Illinois law, such an implied covenant may not supersede the plain language of the contract. The Court also finds that AMCI did not modify its agency agreement with Metro so as to include letters representing that it was the policy of AMCI to treat its agents substantially equally. Despite Metro's claim that the letters constitute a valid modification, there is no evidence that the parties satisfied the requirements for the creation of a contract or reached a contract through the doctrine of promissory estoppel. The Court further finds that AMCI did not breach its duty to Plaintiffs because the agency contracts created no duty in AMCI to refrain from discriminating against Plaintiffs. Finally, the Court finds that Plaintiffs failed to satisfy the elements of their Robinson–Patman Act claim.

As the Court has granted summary judgment on Defendant's substantive arguments, there is no need to address the damages arguments.

For the above reasons, and the Court being fully advised in the premises.

NOW, THEREFORE;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant's Motion for Summary Judgment is GRANTED and Plaintiffs' Amended Complaint is DISMISSED WITH PREJUDICE.